**UNITED STATES of America,**
**Plaintiff,**

v.

**ELI LILLY & CO., Allied Laboratories, Inc., American Home Products Corporation, Merck & Co., Inc., and Parke, Davis & Company, Defendants.**

Cr. No. 173–58.

United States District Court
D. New Jersey.

July 8, 1959.

Lewis Bernstein, Bernard M. Hollander, William P. Cassedy, William H. Copenhaver, Washington, D. C., Stephen R. Lang, Alexandria, Va., Attorneys, Department of Justice, for the motion and the proffer.

Richard J. Hughes, Trenton, N. J., Dewey, Ballantine, Bushby, Palmer & Wood, New York Bar, by Thomas E. Dewey, Everett I. Willis, Leonard Joseph, Robert Pitofsky, James T. Harris, New York City, of counsel, for Eli Lilly & Co.

Minton, Dinsmore & Bohlinger, Trenton, N. J., by H. Colin Minton, Jr., John R. Heher, Trenton, N. J., Sullivan & Cromwell, New York Bar, by William Piel, Jr., New York City, Blackmar, Swanson, Midgley, Jones & Eager, Kansas City, Mo., Missouri Bar, by Kenneth E. Midgley, Kansas City, Mo., of counsel, for Allied Laboratories, Inc.

Pitney, Hardin & Ward, Newark, N. J., by Frank C. O'Brien, Newark, N. J.,

Donovan, Leisure, Newton & Irvine, New York Bar, by Ralstone R. Irvine, Roy W. McDonald, Robert M. Loeffler, New York City, of counsel, for American Home Products Corporation.

Katzenbach, Gildea & Rudner, Trenton, N. J., by George Gildea, Richard M. Kohn, Trenton, N. J., Drinker, Biddle & Reath, Philadelphia, Pa., Pennsylvania Bar, by Charles J. Biddle, John G. Williams, Patrick T. Ryan, Philadelphia, Pa., of counsel, for Merck & Co., Inc.

Thorn Lord, Trenton, N. J., Covington & Burling, District of Columbia Bar, by Gerhard A. Gesell, Washington, D. C., Stephen Pollak, Washington, D. C., District of Columbia Bar, James E. Tobin, Detroit, Mich., Michigan Bar, of counsel, for Parke, Davis & Co. contra the motion and the proffer.

FORMAN, Chief Judge.

In this prosecution for violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1 (1952 ed.), Eli Lilly and Company, Allied Laboratories, Inc., American Home Products Corporation, Merck & Co., Inc., and Parke, Davis & Company, are charged with conspiring to fix the prices at which poliomyelitis vaccine, commonly known and referred to herein as Salk vaccine, was sold to public authorities within the United States. The Government now moves under Federal Rule of Criminal Procedure 17(c)[1] for the issuance of subpoenae duces tecum to compel the defendants to produce before trial certain documents having to do with the pricing of Salk vaccine to public authorities in the United States from January 1, 1955 to December 31, 1957.

There is also before the court a proffer of proof by the Government of foreign sales of Salk vaccine by the defendants. The motion under Rule 17(c) will be considered first.

Although raised by but one defendant,[2] Allied Laboratories, and only indirectly by it, attention must first be given to the question of whether or not the Government may employ Rule 17(c) against these defendants. As pointed out by Allied, "The history of judicial construction of the provisions of the last sentence of Rule 17(c), under which this motion is made, is mainly a history of applications *by defendants* to compel production of documents by the Government." Indeed research yields not a single case in which the Government utilized this rule directly against a defendant. But the lack of its employment by the Government does not mean that it is not available. In United States v. Carter, D.C.1954, 15 F.R.D. 367, 369, Judge Holtzoff quoted the following excerpt from the "Committee notes to the Second Preliminary Draft of the Rules":

> "The last sentence provides for a method by which the court may permit either side to inspect subpoenaed documents or objects under the supervision of the court. It is inserted in the interests of fairness and for the purpose of preventing delay during the trial, particularly in cases where numerous documents may have been subpoenaed."

Judge Holtzoff also found, however, that in the case of an individual defendant "no reciprocal right of discovery [ex-

---

1. "(c) For Production of Documentary Evidence and of Objects. A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys." Fed.Rules Cr.Proc. Rule 17(c), 18 U.S.C.A.

2. Any argument urged by an individual defendant which has application to all defendants has been considered as if made by all defendants.

ists] in favor of the Government, since such discovery would probably be a violation of defendant's constitutional rights." Corporations, however, enjoy no such privilege against self-incrimination and there is therefore, no reason to deny the Government the opportunity to employ the Rule in this case.

■ On its face the Rule permits the court to require production of "the books, papers, documents or other objects designated [in the subpoena duces tecum]", reserving to the court discretion to quash or modify the subpoena "if compliance would be unreasonable or oppressive." As Judge Holtzoff held in Carter, supra, at page 371:

"Rule 17(c) is applicable only to such documents or objects as would be admissible in evidence at the trial, or which may be used for impeachment purposes."

Considering both the plain language of the Rule itself and the Carter case, supra, I conclude that Rule 17(c) is available in a proper case to the Government as well as the defendant.

In Bowman Dairy Co. v. United States, 1950, 341 U.S. 214, at page 220, 71 S.Ct. 675, at page 679, 95 L.Ed. 879, the Court held:

"It was not intended by Rule 16 to give a limited right of discovery, and then by Rule 17 to give a right

of discovery in the broadest terms. Rule 17 provided for the usual subpoena ad testificandum and duces tecum, which may be issued by the clerk, with the provision that the court may direct the materials designated in the subpoena duces tecum to be produced at a specified time and place for inspection by the defendant. * * *"

■ Having quoted this very language, Judge Weinfeld, in United States v. Iozia, S.D.N.Y.1952, 13 F.R.D. 335, at page 338, said:

"Good cause, in my opinion, requires a showing by the defendant,

"(1) That the documents are evidentiary and relevant:

"(2) That they are not otherwise procurable by the defendant reasonably in advance of trial by exercise of due diligence;

"(3) That the defendant cannot properly prepare for trial without such production and inspection in advance of trial and the failure to obtain such inspection may tend unreasonably to delay the trial;

"(4) That the application is made in good faith and is not intended as a general fishing expedition."

Originally the Government's motion was very broad and sweeping.[3] How-

---

3. "With reference to poliomyelitis vaccine:

"1. All books, papers or documents maintained by your company during the period January 1, 1954 through December 31, 1957, which contain entries in accounts which set forth net sales, costs of goods sold, research and development expenses, selling expenses, general and administrative expenses, and other income and expenses.

"2. All reports and memoranda prepared during the period January 1, 1955 through December 31, 1957, by your company's accounting personnel for the use of management officials or other corporate personnel showing your company's receipts and disbursements.

"3. All profit and loss statements prepared during the period January 1, 1954 through December 31, 1957, concerning

poliomyelitis vaccine or any class of products within which poliomyelitis vaccine was included, when such statements were not specifically prepared for poliomyelitis vaccine.

"4. All books, papers or documents (e. g., chart of accounts or index of accounts, etc.) used by your company to index the names and numbers of the accounts regularly maintained by your company which during the period January 1, 1954 through December 31, 1957, contained entries relating to net sales, cost of goods sold, research and development expenses, selling expenses, general and administrative expenses, and other income and expenses.

"With reference to poliomyelitis vaccine and such other products which might

ever, at oral argument the Government agreed that it was seeking only those "documents that were prepared for the purpose of aiding in the pricing of the vaccine * * * whether or not [they were] used." The affidavit filed in support of the motion reads in part, "Accordingly, the materials sought by the subpoena are for the purpose of evidencing (1) that costs were disparate, and (2) that profit margins for poliomyelitis vaccine were higher than such margins for other similar products marketed by the defendants." At oral argument the Government disavowed the second of these purposes, as noted hereinafter [24 F.R.D. 293].

Applying the Iozia test, the Government's first hurdle is relevancy. To meet it the Government contends that "when disparate costs are evidenced in addition to numerous other circumstances, especially if those costs were accompanied by unusually high profit margins it may be inferred that the uniformity of price was the result of an illegal agreement and nothing else." And further that "if it should turn out that the cost levels of all defendants for the manufacture, sale and distribution of polio vaccine were well below the uniform prices set by defendants, a jury might well conclude that this, coupled with the Government's other evidence, indicates the existence of an illegal agreement to tamper with the price structure."

Lastly, the Government avers that since its case will be one of circumstantial evidence it must show disparate costs in order to eliminate the reasonable hypothesis of innocence that uniform prices were the result of uniform costs.

In reply the defendants contend that cost is not *the* determinant in establishing price and to that extent the Government's argument rests on a false premise; and that profit margins are irrelevant and immaterial to the issue of this case.

To support the economic theory that cost is not *the* determinant in the setting of a price the defendants have submitted the affidavits of corporate officers and economists who depose that such factors as homogeneity of product, estimated

be included therewith to form a class of products:

"5. All manuals or other designated books, papers or records maintained by your company during the period January 1, 1954 through December 31, 1957 which contained instructions to officers or employees concerning the manner in which receipts and disbursements for poliomyelitis vaccine or class of products within which poliomyelitis vaccine was included, were to be determined by allocation, whenever such receipts and disbursements were not specifically maintained for poliomyelitis vaccine.

"6. All schedules or work papers containing entries which indicate the sources from which were obtained the items and amounts set forth in tabular summaries which were prepared in behalf of your company in connection with the grand jury proceedings which resulted in the indictment filed in this action."

In its reply memorandum the Government conceded "that if all defendants agree to execute an appropriate stipulation the subpoenaed material is not need-

ed to evidence disparate costs. Accordingly there would be no need for the Government to subpoena the books, manuals, and work sheets in items 1, 4, 5 and 6 of the proposed subpoena. The following is all that would be required:

"All papers or documents which contain reports, memoranda, financial statements, studies and analyses of sales and costs (including unit costs) for the development, manufacture, distribution and sale of poliomyelitis vaccine and which were prepared during the period January 1, 1955 through December 31, 1957, for use by:

"(a) officials who participated in the pricing of poliomyelitis vaccine;

"(b) other corporate personnel who, in the regular course of their employment, participated in the pricing of the company's products whether or not, in fact, they participated to the same extent, or at all, in the pricing of poliomyelitis vaccine;

"(c) the controller or treasurer and/or accounting personnel."

period of obsolescence, knowledge of competitors' prices, number of producers, desired rate of return on capital investment and the law of supply and demand all play important roles in the pricing of any product. Moreover, say the deponents, in the case of Salk vaccine other considerations in addition to the foregoing were present, e. g., the danger of corporate disaster, unprecedented governmental regulation, unequalled public interest and the probability of enormous demand followed by a rapid decline in the market.

Applying all of these influences to the pricing of Salk vaccine the defendants contend that the vaccine is necessarily homogeneous by virtue of governmental regulation and inspection and that in any series of inoculations an individual might be properly treated with the vaccine of different manufacturers.

At page 5 of its brief Eli Lilly and Company states:

> " * * * Sellers of homogeneous products must meet the price of competitors or risk injury to their competitive position in the market and to their reputation among customers. If a producer's costs are relatively high it is faced with the choice of meeting competitive prices and taking a smaller profit or abandoning the market."

The validity of this argument is seen say the defendants in the fact that an informed buyer will not pay more to one producer than to another for a homogeneous product, e. g., clothespins, soda ash, and therefore the fact that costs are disparate has no probative value and is as consistent with innocence as with guilt.

Defendants contend that normally the estimated period of obsolescence for drug products is five years, but that in the case of Salk vaccine it was estimated at three years, due in some measure to the fact that even at the time of initial production of the vaccine, drug houses other than defendants' had al-ready embarked on a program leading to the marketing of a live virus vaccine designed to replace the Salk vaccine. This shortened estimated period of obsolescence necessitated a more rapid return of investment, and inferentially, at least, would appear to have resulted in a price somewhat higher than would have otherwise obtained, contend the defendants.

Defendants claim that there was complete access to the prices set by any one of them by reason of the limited number of producers and necessary disclosures to distributors, retailers and governmental agencies; that each knew the prices of the others almost immediately, but that responsibility to the public and shareholders alike precluded charging a price higher than that asked by any other producer-defendant; and that business acumen indicated no reason to set a price below that of a competitor. Admittedly, however, certain changes did occur and these according to the defendants were always a reduction in price because any other course of conduct would have incurred unanimous public disapproval.

In terms of the law of supply and demand it appears that a seller's market existed for Salk vaccine during the first years of production. This condition would seem to have resulted in high prices. But the defendants contend that this approach is invalid because it does not take into account that while a buyer may be forced to pay a high price in such a market he will retaliate by not buying a particular manufacturer's goods when the opportunity for choice arises. According to the defendants, price tampering would have incurred vigorous public criticism with a consequent loss of reputation, and would have been a breach of public responsibility.

The defendants further contend that the seller's market which obtained during the first two years of production of the vaccine was destined to diminish rapidly once mass immunization of the

population was achieved and the public demand lessened; and that the danger of corporate disaster lurked in every batch of vaccine produced and distributed, for an impure shipment could result in great injury to the users, and liability to the defendants.

Undoubtedly the public exhibited a great interest in the production of the Salk vaccine. Indeed this interest resulted in the complete regulation by the federal government of the manufacture and distribution of the vaccine during the period of government control. The Government became the largest single customer for Salk vaccine. And in addition there existed between the Government and the defendants a most favored customer clause by virtue of which the Government became immediately entitled to any price reduction given to any public authority within the United States.

Based on these considerations the defendants assert that costs are irrelevant. That all of these factors bear on price need not be denied. But the Government does not contend that cost is the only yardstick by which the issue of this case is to be decided. Rather, says the Government, cost is one item which, when taken with other evidence, will justify the jury in finding the existence of an agreement to fix the price of Salk vaccine to public authorities within the United States. The other evidence proposed by the Government is:

"(a) three of the five defendants knew the original list price to be set for poliomyelitis vaccine prior to any public announcement thereof;

"(b) extremely rigid vertical price maintenance was undertaken by each defendant, in order to insure uniform prices to public authority;

"(c) different prices for polio vaccine prevailed among defendants in their sales to classes of customers other than public authority;

"(d) each defendant refused to sell polio vaccine to public authority on anything other than a delivered price basis;

"(e) each defendant refused to sell polio vaccine to public authority at prices which included quantity discounts;

"(f) each defendant refused to sell short-dated polio vaccine to public authority at reduced prices,".

The defendants, however, contend that these varied factors militate conclusively against any finding that a price-fixing agreement existed among them. But that is the very issue in this case and cannot, therefore be resolved at this time. This is not to say that ultimately the defendants' contentions in this regard may not be found by the jury to be meritorious, if urged at trial, but only that at this stage of the proceedings they do not serve to disprove or overcome what I find on this motion to be the liminal relevancy of the documents.

Having demonstrated the defendants' costs the Government would endeavor to establish that the profits realized on vaccine were unusually high and that this evidences an intent to set a uniform price. Defendants contend that if the Government is to be permitted to make this argument it must first produce proof of comparable products and the profits realized therefrom, but that there are no products comparable to the Salk vaccine and therefore no standard exists by which to measure those profits.

In support of their position the defendants cite United States v. E. I. du Pont de Nemours & Co., 1956, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264, for the proposition that profit evidence is admissible only after a showing of profits on comparable products. However, in du Pont which was a monopoly case, the Court said, 351 U.S. at page 404, 76 S.Ct. at page 1012:

"* * * Nor can we say that du Pont's profits, while liberal * * * demonstrate the existence of a monopoly without proof of lack

of *comparable profits* during those years *in other prosperous industries.* * * * " (Emphasis supplied.)

Thus the Court was requiring not proof of profits derived from comparable products, but proof of a lack of comparable profits from other profitable industries, in a monopoly case.

The Government has also stated that since this will be a case of circumstantial evidence it must demonstrate that uniform prices did not evolve from uniform costs, in order to negate a reasonable hypothesis of innocence. Defendants have agreed to stipulate that their costs were disparate and urge that this obviates any Government need for the documents themselves. While the stipulation supplies the fact of difference, the documents serve to delineate that difference among the defendants in the light of which the jury may be better able to evaluate the evidence.

Defendants have advanced additional reasons for not granting this motion, even assuming relevancy. They contend that the probative value of their costs is insufficient to justify (1) the necessary disclosure of their highly valued and closely guarded trade secrets, traditionally confidential even within the corporation itself, (2) the delay in trial occasioned by the Government's presentation of the material and lengthened, necessarily, by their defense thereto and after, (3) confusing the jury and prejudicing the defendants by virtue of their having made a profit on the sale of Salk vaccine.

With regard to prolonging the proceedings the defendants contend that the introduction of this evidence by the Government will necessitate such extensive rebuttal as to outweigh the probative value of the documents sought by the Government, granting their relevance and admissibility. Specifically, Allied Laboratories, in its Supplemental Memorandum contemplates the necessary submission of "extensive factual proof as to the history of the development, production, promotion, merchandising, pricing and market conditions of many other products, in order to put management decisions as to polio vaccine in appropriate factual context for comparison, contrast and explanation", in order to meet the Government's evidence as to whether or not the cost levels of all defendants were well below the prices set.

Allied further represents in an accompanying offer of proof that this would entail an analysis of 72 new items and their 68 respective shelf costs to price ratios, which analysis would demonstrate first, that Allied's products are not susceptible of being catagorized in terms of shelf costs to price, and second, that "polio vaccine has been well within [Allied's] normal range of such ratios."

Even the prospect of such complex and lengthy proof upon the part of the defense does not weigh sufficiently to deprive the Government of the opportunity it seeks to avail itself of what it deems crucial evidence in support of its case. On the other hand, no matter how time taking the counter proofs may be the defendants must have full and ample opportunity to advance them. It can only be hoped that continued cooperation upon the part of counsel in appropriate pretrial stipulations may reduce the prolongation of the trial to a minimum.

As to the first of these contentions it should be noted that the material sought was designed for use during the period of January 1, 1955 to December 31, 1957, already a year and a half to four and a half years past. In view of this circumstance it seems unlikely that the defendants will sustain any appreciable loss of their trade secrets by virtue of the disclosure of this material. The law is clear "that a party has no absolute right to refuse to divulge information in the course of litigation upon the sole ground that the giving of the information will necessarily involve the disclosure of trade secrets. The

privilege is conditioned upon the circumstances of the particular case, and the extent to which the disclosure of secrets will be compelled is a matter largely resting upon the court's discretion." Cities Service Oil Co. v. Celanese Corp. of America, D.Del.1950, 10 F. R.D. 458, 460, cited in International Nickel Co. v. Ford Motor Co., S.D. N.Y.1954, 15 F.R.D. 392. Cf. Zenith Radio Corp. v. Radio. Corp. of America, D.Del.1952, 106 F.Supp. 561, 565, where the court observed in a footnote that

> "in the absence of a strong showing of relevance a party will not be required to disclose confidential information."

but also noted at page 576 that

> "There are differences between a government antitrust suit, a private one, and a misuse defense as to the holder of a patent. These differences are not merely doctrinal. They depend upon the facts of each case."

In the light of these cases, the potential probative value of the cost documents sought by the Government, and the fact that injury to the defendants by requiring the disclosure of this material appears to be slight, I find no merit in this objection.

The possibility of confusing the jury and prejudicing the defendants by admitting this evidence at trial presents a somewhat different problem. Essentially the defendants contend that the introduction of the cost documents by the Government will necessitate extensive rebuttal in that the methods of price determination will have to be put before the jury if that body is to properly pass upon the matter in issue. Undoubtedly this will be a time consuming process as presently contemplated by the defendants and one in which the possibility of confusing the jury cannot be lightly dismissed. But this consideration is outweighed by the potential probative value of that which is sought. Furthermore counsel on both sides and the court

will be required to minimize the possibility of confusion.

The possibility of prejudicing the defendants in the minds of the jury is bottomed on the contention that the Government desires to place the profits realized on the vaccine before the jury in the hope that this evidence alone will inflame the panel to return an adverse finding. In its Supplemental Brief, American Home Products alleges that the Government's sole purpose in seeking the cost documents is "[to authorize] the jury to convict if in its opinion the prices set yielded an unreasonable profit."

But the Government has said that its purpose is to put to the jury the reasonableness of the pricing official's explanation as to how the price of Salk vaccine to public authorities within the United States was set, and not profit itself. Furthermore, the irrelevance of profits alone in this case will be a matter for instruction by the court.

The Government has further represented that it does not intend to compare the profit anticipated on Salk vaccine with the profit anticipated on other products. Indeed the Government explicitly denied any intention to introduce such evidence at oral argument on this motion.

Defendants contend further that they do not know, nor are they able to ascertain the total cost of the vaccine, and that partial cost is inadmissible.

It would seem that no pricing official would come to a determination as to price without knowledge within reason as to costs, lest a price disastrously under cost be arrived at and offered. The Government now seeks such documents as may have been prepared to aid each pricing official in fixing the price of his vaccine to public authorities in the United States, whether or not he used such documents. With this evidence the Government may seek to examine the pricing officials as to whether or not their determinations were based upon these

documents. This now appears to be a relevant and material inquiry but of course would be subject to rulings upon objections which might be interposed.

I have not overlooked the contention of Allied that in the light of the unprecedented circumstances attending the initial marketing of the vaccine even if one or more defendants employed "normal" or "regular" mark-ups and even if the pricing of Salk vaccine departed therefrom, "this would only fairly tend to show that it was a special case for some reason" and that any departure from normal price setting therefore "is readily consistent with a non-collusive opportunity and motivation." But while this material may properly be for the jury it does not derogate the potential probative value of the Government's present proffer.

The next requirements which the Government must meet are that the material sought cannot be otherwise procured; that the Government cannot otherwise adequately prepare for trial and that production at trial will cause undue delay. It is obvious that there is no other source from which these documents may be obtained, and that production at trial will in fact result in undue delay.

Having accepted the Government's theory as to the relevancy of these documents I am constrained to conclude that it cannot adequately prepare for trial without them.

 The last consideration is whether the Government is operating in good faith or embarking on a fishing expedition in seeking these documents. It cannot be gainsaid that "Rule 17(c) was not intended to provide an additional means of discovery. Its chief innovation was to expedite the trial by providing a time and place *before* trial for the inspection of the subpoenaed materials." Bowman Dairy Co. v. United States, supra, 341 U.S. at page 220, 71 S.Ct. at page 679. Whether the movant in a particular case is attempting to obtain discovery under the guise of this rule is a question the answer to which depends on the facts of each case. Thus, "Rule 17(c) * * * has only the limited function of procuring the production of papers for use in evidence at a trial." United States v. O'Connor, D.Mass. 1953, 118 F.Supp. 248, 250.

In the instant case the Government has represented that it fully expects to submit the cost documents in evidence at trial. The fact that the Government has not seen these particular documents might lead to the conclusion that it is engaged in a fishing expedition except that it has seen summaries apparently prepared from the documents now sought. Furthermore, there seems to be every probability that such documents exist. That fact together with the Government's announced intention to put this material before the jury operates to remove the element of a fishing expedition.

 Based on the foregoing I am constrained to grant the Government's motion for the issuance of subpoenae duces tecum requiring the production by each defendant before trial of those documents relating to the cost of the vaccine, which were prepared for the purpose of aiding in the pricing of the vaccine, whether or not they were used. An order should be submitted on notice providing for the issuance and form of the subpoenae.

## PROFFER OF PROOF

The Government has made a proffer of proof that the defendants treated sales to foreign public authorities differently than they treated sales to domestic public authorities during the period August 1, 1956 to December 31, 1957. It contends that the contrasting treatment of foreign and domestic sales constitutes a circumstance which, when considered with other evidence in the case, furnishes the basis for a valid inference by the jury that the defendants conspired to agree to the prices at which the vaccine would be sold in the United States, as charged in the indictment.

The proffer is two pronged. First, the "Government purposes to prove that when the defendants offered poliomyelitis vaccine for sale to public authorities not alleged to be objects of the conspiracy, their prices were disparate;" and second "that three of the five defendants authorized the submission of quotations in their behalf below their established prices, to public authorities not alleged to be objects of the conspiracy, while at the same time they never deviated from their established prices in making quotations to the public authorities" in the United States.

The actual proffers are as follow:

### CITED INSTANCES OF DISPARATE BIDDING

"August, 1956

"1. Venezuela

| | |
|---|---|
| Lilly | $5.70 F.O.B. Indianapolis |
| Sharp & Dohme (Merck & Co.) | 5.43 F.O.B. New York |
| Wyeth (American Home Products) | 5.43 (Freight terms unknown) |

"2. Costa Rica [4]

| | | |
|---|---|---|
| Parke, Davis | $5.73 | (less 2%) C.I.F. |
| Lilly | 5.63 | (less 2%) C.I.F. |
| Sharp & Dohme | 5.75 | (discount unknown, if any) C.I.F. |
| Pitman-Moore (Allied) | 5.46 | ( " " " " ) C.I.F. |
| Wyeth | 5.76 | ( " " " " ) C.I.F. |

"3. Costa Rica

| | | |
|---|---|---|
| Sharp & Dohme | $5.45 | C.I.F. (discount unknown, if any) |
| Pitman-Moore | 5.61 | " ( " " " " ) |
| Wyeth | 5.75 | (discount unknown, if any) C.I.F. |
| Parke, Davis | 5.73 | (less 2%) C.I.F. |
| Lilly | 5.63 | (discount unknown, if any) C.I.F. |

"December, 1956

"4. Uruguay

| | | |
|---|---|---|
| Pitman-Moore | $5.37 | C.I.F. (discount unknown, if any) |
| Parke, Davis | 5.71 | C.I.F. ( " " " " ) |
| Sharp & Dohme | 5.845 | C.I.F. ( " " " " ) |
| Wyeth | 5.71 | C.I.F. ( " " " " ) |
| Lilly | 5.77 | C.I.F. ( " " " " ) |

"August, 1957

"5. Uruguay

| | | |
|---|---|---|
| Sharp & Dohme | $5.0274 | (discount unknown, if any) (freight terms unknown) |
| Lilly | 5.13 | (less 2%) (freight terms unknown) |
| Pitman-Moore | 4.7274 | (discount unknown, if any) (freight terms unknown) |
| Parke, Davis | 4.79 | (less 2%) (freight terms unknown)" |

4. It appears that the first Costa Rican bid was not acted upon and that rebids were invited. These appear as group 3 under the heading Costa Rica.

CITED INSTANCES OF BIDDING BELOW ESTABLISHED PRICES

"Established Price: $5.70 (less 2%), or $5.586 net

| Approximate Date | Public Authority | Price Per 9-cc Vial | |
|---|---|---|---|
| (1) Parke, Davis | | | |
| 8–25–56 | Argentina | $4.50 | * |
| 10–5–56 | Argentina | 5.13 | * |

"Established Price: $5.13 (less 2%), or $5.0274 net.

| | | | |
|---|---|---|---|
| (2) Parke, Davis | | | |
| 7–26–57 | Uruguay | $5.02 | net |
| 8–20–57 | Brazil | 5.025 | net |
| 11–5–57 | Chile | 4.62 | * |
| (3) Pitman-Moore | | | |
| 6–7–57 | Brazil | $5.027 | net |
| 6–18–57 | Brazil | 5.027 | net |
| 6–18–57 | Korea | 5.027 | net |
| 8–22–57 | Brazil | 5.027 | net |
| 9–30–57 | Brazil | 5.027 | net |
| 11–8–57 | Hungary and Bulgaria | 4.50 | (2%) |
| 11–20–57 | Austria | 4.50 | (2%) |
| 11–22–57 | South Africa | 4.50 | (2%) |
| 11–27–57 | Formosa | 4.50 | (2%) |
| 11–27–57 | Lebanon | 4.50 | (2%) |
| 12–6–57 | Germany | 4.50 | * |
| 12–6–57 | South Korea | 4.50 | (2%) |
| 12–9–57 | Netherlands Antilles | 4.50 | * |
| 12–10–57 | Germany | 4.50 | * |
| 12–12–57 | Egypt | 4.50 | (2%) |
| 12–20–57 | Okinawa | 4.50 | (2%) |
| 12–26–57 | South Korea | 4.50 | (2%) |
| 12–26–57 | Germany | 4.50 | (2%) |
| 12–28–57 | Brazil | 4.50 | (2%) |
| 12–30–57 | Brazil | 4.50 | (2%) |
| 12–31–57 | Italy | 3.90 | * |
| (4) Sharp & Dohme | | | |
| 7–11–57 | Brazil | $5.027 | * |
| 10–22–57 | Finland | 4.85 | (2%) |

"Established Price: $2.33 (less 2%), or $2.2834.

| | | Price Per 3-cc Vial | | |
|---|---|---|---|---|
| (5) Pitman-Moore | | | | |
| 9–12–56 | Argentina | $1.31 | * | " |

* Discount unknown, if any.

The Government contends that the sales to foreign and domestic public authorities are comparable based on the following factors, which it asserts obtained in both markets during the period August 1, 1956 to December 31, 1957: (1) Homogeniety of product, (2) Enormous demand and short supply, (3) All pertinent sales were to public authorities, (4) Great public interest, (5) Immediate knowledge of competitors' prices, (6) Identity of manufacturing costs, (7) Equal applicability of most favored customer clause, (8) Absence of foreign producers until after the summer of 1957, and (9) Absence of Government allocation program.

The defendants concede the application of factors (1) through (6), but deny that the markets are comparable because of other circumstances. As to (7), the applicability of the most favored customer clause, Allied Laboratories states in its brief [5] that until the expiration of its Government contract, June 30, 1957, it submitted its foreign bids on the assumption that this clause obtained as to those sales. Merck & Co., on the other hand, denies the application of that clause without indicating whether or not its foreign bidding was in any way affected thereby. As to (8), Allied maintains that foreign producers were active in the foreign market during the summer of 1957, although it does seem to agree that manufacturers were not in full production until after that time. The defendants state that a different number of producers were active in the foreign market than in the domestic, i. e., "the vaccine either was being produced or was in process of development for production in laboratories in Belgium, Canada, Denmark, England, Germany, Mexico, and the Union of South Africa," and "foreign-made vaccine was already being offered in the export markets prior to the partial lifting of United States export restrictions in August 1956."

Defendants maintain with regard to (9), that the Government's allocation program precluded exporting Salk vaccine except to those nations which had set up a form of distribution through public authorities as in the United States, although admittedly as among such countries there was no limit placed on the quantity exported.

In its brief Allied alleges that it was using Salk vaccine "as an entering wedge for the penetration of certain export markets."; that it reduced its export price in November 1957 to meet competition abroad, as it allegedly did domestically on April 18, 1957, in order to meet a reduction by Merck & Co., and that this factor together with living standards and price levels abroad would necessarily have to receive consideration before any comparison of markets could be found or inferences permitted the jury.

The defendants next contend that this evidence of foreign sales will "arouse chauvinistic prejudice in the jury box or * * * suggest to the jury that the particular defendant in question 'could have afforded' to charge less in the domestic market."

Indeed it cannot be gainsaid that this is a real possibility. Nevertheless if otherwise admissible I would not exclude this evidence on this ground. Furthermore, if this material is admitted in evidence the defendants will be afforded ample opportunity to counteract any such effects and the jury will be instructed by the court on the irrelevance of profits.

At page 15 of its brief, Allied asserts that:

"From the lifting of the export embargo in August 1956 until the

5. All the defendants, except Parke, Davis & Company, have expressly joined in concurring with the contentions, opinions and conclusions expressed by Allied Laboratories in its brief. Eli Lilly and Company and Merck & Co., in addition have filed their own briefs, supplementing that of Allied.

expiration of [its] last contract with the Federal Government on June 30, 1957, [its] Export Department never deviated intentionally from a practice of quoting and selling to governmental agencies in foreign countries at a price equal to or above the price currently charged by [it] to governmental agencies in the United States."

According to Allied this practice in part resulted from a concern as to the applicability of the most favored customer clause in sales to foreign public authorities as noted heretofore. Thus argues Allied, while its Domestic Sales Department would not quote a price higher than that of a competitor for fear of adverse criticism its Export Department was under no such disability, but was only required to maintain its prices at the same or higher level than those at home. Allied contends that it was after the expiration of its contract with the Government on June 30, 1957, that its Export Department reduced its prices to meet competition as did the Domestic Department.

Three of the defendants, Eli Lilly & Company, Allied Laboratories, Inc. and Merck & Co., Inc., have submitted what each represents to be the basis upon which it made the foreign bids cited by the Government. American Home Products Corporation and Parke, Davis & Company, have not made any such submissions.

Lilly, which is cited by the Government only in those instances pertaining to disparate bidding, represents that in each cited instance it bid the then established domestic price with an adjustment for shipping terms and delivery costs. In the case of the December 1956 bid to Uruguay there was also a 1% statutory discount of which that government elected to avail itself rather than the usual 2% prompt payment discount, alternately available. On its face the Government's proffer supports these assertions.

The Government, however, contends that Lilly presented a choice of shipping terms to the foreign public authorities whereas it and the other defendants refused to quote non-delivered prices although requested to do so by domestic authorities.

Allied states in regard to the disparate bids that the first Costa Rican bid and both Uruguayan bids were unauthorized; and that the second Costa Rican bid was the domestic price plus an allowance for shipping. It further represents that although it refused to ship on the first Uruguayan bid, it nevertheless received a part of the order which it filled and for which it charged and was paid at its authorized price of $5.57 net C.I.F., i. e., the domestic price of $5.70 less 2% discount ($5.586) plus shipping adjustment.

The Government disputes Allied's assertion that it refused to ship on the allegedly unauthorized bids.

With regard to bidding below the established price to domestic public authorities, Allied contends that its bids of $5.027, as opposed to $5.0274 ($5.13 less 2%), while made when the Government contract was in effect were not to be delivered until after the expiration of that contract, and were made in order to meet "a particular local competitive situation."

Its bids of $4.50, beginning in November 1957 constituted a reduction made necessary by foreign competition according to Allied. The quotation of $3.90 in Italy it represents as "a special price extended to a commercial concern in Italy with which Pitman-Moore had made financial plans and arrangements for the promotion of its general business, culminating in the acquisition of a majority stock interest."

The bid of $1.31 per 3 cc vial to Argentina in September 1956 involved, says Allied, short-dated vaccine, i. e., vaccine near its expiration date. Allied notes that it had made a similar sale to the State of Montana in August of 1956,

for less than the established price. According to the Bill of Particulars the price to Montana was $1.91.

Merck & Co. submits that its Venezuelan bid was made to meet that of American Home Products; that its first Costa Rican bid was $5.70 F.O.B. or $5.75 C.I.F. less 2% discount; that its second Costa Rican bid of $5.45 was made in an effort to meet Allied's first Costa Rican bid of $5.46 which it apparently thought would be rebid; that its first Uruguayan bid was at the then established domestic price of $5.70 plus .145 cents for shipping (Merck & Co. makes no mention here of either the customary 2% discount or the 1% statutory discount referred to by Lilly); and that its second Uruguayan bid was at the domestic price of $5.13 less 2% ($5.0274).

With reference to the instances of foreign bidding below the then established price to domestic public authorities Merck & Co. contends that its bid in Brazil was submitted by Merck, Sharpe & Dohme S. A., a Brazilian corporation with principal offices in Rio de Janiero and Campinas, which originally quoted $5.0274 (the domestic price of $5.13 less 2%) but reduced that to $5.027 upon learning that another company had quoted the latter figure. Its Finland bid was made according to Merck & Co. by its International Division which quoted a price of $5.0274 C.I.F. net to Lejos Oy, "an independent distributor in Helsinki for sale to the Medicinal Board of Finland" but when the distributor learned of a competitor's bid of $4.85 less 2% he met it in order to gain distribution of the Merck product throughout Finland.

While these explanations may reveal the basis upon which each of three of the defendants acted in quoting the bids cited by the Government they do not deny or disprove either disparite bidding or bidding beneath the then established price to domestic public authorities, as the Government alleges. The fact of disparity and underbidding, for whatever reason, remains.

As to the materiality of the proffer Allied Laboratories represents that of a total of 4,500,000 cc of Salk vaccine exported by it during August 1956 to December 1957, only 30,000 cc, or ⅔ of 1% are involved in the four instances of price disparity in which it is cited by the Government. In view of its allegations that these bids are but four out of literally hundreds, Allied urges that they are immaterial.

Eli Lilly & Company also urges immateriality and states that only 145,760 cc or 1½% of its total vaccine exports are involved in the instances of disparity cited by the Government.

Furthermore, contend the defendants, the Government has admitted that instances of domestic price disparity did exist. Thus in Allied's brief it is alleged that the "Government's bill of particulars reveals several dozen instances of domestic public authority bidding situations in which there was disparity of bids by manufacturers and local bidders (who in many instances, as was also the case in export markets, were bidding as agents for manufacturers). In some 40 of these instances at least one of the bids was below what the Government in its Proffer of Proof has called 'the established price', * * *."

The full effect of the Government's proposal in the light of the foregoing says Allied, results in a conclusion that "If 'certain exceptions' to parity of price quotations at home do not confound a claim of conspiracy, then 'certain exceptions' abroad surely do not provide any meaningful contrast of conduct at home and conduct abroad." Eli Lilly phrases this same thought as follows: "Viewed fairly, the situation is not one of price disparity abroad and price uniformity at home, but rather one of a degree of price disparity both at home and abroad. It is therefore difficult to understand how instances of disparity abroad can evidence conspiracy at home. The Government could with equal validity assert

that the instances of disparity at home evidence conspiracy abroad."

■ To support these contentions Allied has cited certain instances of domestic bidding at prices below those then established, only one of which appears to have occurred during the period August 1, 1956 to December 31, 1957, covered by the proffer. I cannot agree that one instance of bidding below the then established price in Maryland on December 19, 1957, operates to defeat the Government's proffer. I therefore conclude that this proof is both relevant and material and in so doing I am not unmindful that the proffer extends to only a relatively small portion of the foreign market. But quantity of proof is not necessarily the criterion here. It is bromidic to dilate upon the proposition that conspiracies are rarely proven except upon circumstantial evidence. The smallness of the circumstances with which we are dealing here does not detract from their materiality or relevance. Whether it is so material as to justify lengthening the trial is another and more difficult question.

Defendants rely on United States v. National City Lines, 7 Cir., 1951, 186 F. 2d 562 a criminal prosecution for conspiring to monopolize certain portions of interstate commerce in violation of Section 2 of the Sherman Act, 15 U.S.C.A. § 2 (1952 ed.), in which the court excluded evidence which the defendants sought to introduce. In affirming the district court, Judge Lindley said, at page 573:

"From an examination of the record, it seems apparent to us that the court, endowed with discretion as to the amount of collateral evidence proper, did not abuse its discretion. This is in line with what the Supreme Court said in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, at page 230, 60 S.Ct. 811, at page 847, 84 L.Ed. 1129: 'While the offer was not wholly irrelevant to the issues, it was clearly collateral. The trial court has a wide range for discretion in the exclusion of such evidence. See Golden Reward Mining Co. v. Buxton Mining Co., 8 Cir., 97 F. 413, 416, 417; Chesterfield Mfg. Co. v. Leota Cotton Mills, 8 Cir., 194 F. 358, 359. Admission of testimony showing the market conditions late in 1934 would have opened an inquiry into causal factors as involved and interrelated as those present during the indictment period. That might have confused rather than enlightened the jury. In any event it would not have eliminated the buying programs as contributory causes to the market rise and stability in 1935 and 1936. And it would have prolonged the inquiry and protracted the trial. As once stated by Mr. Justice Holmes, one objection to the introduction of collateral issues is a "purely practical one—a concession to the shortness of life." Reeve v. Dennett, 145 Mass. 23, 28, 11 N.E. 938, 944. * * *' The jury's inquiry was not one as to customs or practices or as to what others had done on other times and occasions. The question before the jury was whether what defendants had done amounted to violation of law as charged. The mere fact, if it be a fact; that other suppliers had followed a similar course of conduct by doing what defendants are charged with doing, would in no wise excuse defendants for their acts if those acts were illegal."

The distinction between the proof proffered there and here is at once apparent. In National City Lines the defendants were trying to put before the court evidence of what others had done, as to which, the court said, at page 572:

"We had thought it well established that evidence of customs and practices in an industry is irrelevant in determining whether there has been an attempted monopolization. This court, in United States v. New York Great Atlantic & Pacific Tea

Company, 7 Cir., 173 F.2d 79, 89, said: 'That others engaged in the same practices as the defendants certainly would not exonerate the defendants or tend to disprove their guilt. Certainly trade customs and practices not shown to have been practiced in the same manner as the defendants were shown to have practiced them would not be competent to show that the defendants' practices were not illegal.' * * * "

But in the case at bar the Government desires to show what the defendants themselves did under allegedly comparable circumstances. I do not see the application of National City Lines to this case.

Defendants point to the fact that with regard to disparity of bids only three countries are cited and that even within these there are three instances of uniformity. They note with regard to bidding beneath the then established domestic price, that only three of the five defendants are cited and these in 19 countries and that six of the instances are lower than the established price by only one twenty-fifth of a cent. Furthermore, say the defendants, rebuttal will be extensive as evidenced by the fact that it may well be necessary for them to introduce their price determinations all over the globe in order to properly refute the Government's proffered proof. In this connection the defendants also cite and rely on the Prettyman Report, 13 F.R.D. 62, 76, which states:

"To hold evidence inadmissible because not necessary to a decision of the issues is somewhat of an expansion of the rule as to materiality, but is not a deviation from the principle of that rule. Whether or not the rule be logically a part of the law of evidence (See Wigmore, Evidence, § 2), it is an established rule in the conduct of trials. 'Materiality' is defined by Bouvier as 'The property of substantial importance or influence, especially as distinguished from formal requirement. Capability of properly influencing the result of the trial.' To exclude that which is of no substantial importance in reaching a decision is well within established principles. Where the quantity of substantially important evidence is great, all proffered evidence not shown to be of that nature should be rejected."

The Prettyman Report, widely recognized for its authoritative suggestions of techniques to increase the efficiency of trial procedure in antitrust and other protracted cases, properly prescribes that the court make a prospective appraisal not of the proof itself standing alone, but of its impact on the jury—a difficult determination and one which in reality can only be approximated. To determine whether or not the proof proffered herein is capable "of properly influencing the result of the trial" attention must be given to the facts it tends to establish and to the potential materiality of those facts. As noted earlier the defendants do not deny the occurrence of the bids cited by the Government although they have characterized certain of them as unauthorized. The question then turns to a consideration of the defendants' replies in opposition to the proffer. These have been set out at length heretofore and are mainly contentions that the foreign and domestic markets are not comparable and therefore activities in the former do not give rise to any inference as to activities in the latter; that the evidence will prejudice the jury against the defendants; that the evidence is immaterial because of its limited extent quantitatively, and because in both markets there were instances of disparity and uniformity; and that this lack of materiality or probative force does not justify a protraction of the trial which would involve receiving not only the proffered evidence but the defendants' extensive rebuttal thereto. My view of all these contentions has already been set out, except as to the last. As to it I

am persuaded at this early stage that the Government's evidence is capable of properly influencing the result in this case, because, if, after hearing it and the other evidence of the Government, as well as the defendants' proofs, the jury should determine that the foreign and domestic markets were comparable it may infer therefrom that bidding such as that cited by the Government in foreign countries would have occurred domestically except for the existence of a conspiracy to agree as charged. And I am driven to this conclusion despite the hazards implicit in what the defendants now contemplate as necessary, lengthy rebuttal presentations.