**UNITED STATES of America**

v.

**CHAS. PFIZER & CO., Inc., John E. Mc-Keen, American Cyanamid Company, Wilbur G. Malcolm, Bristol-Myers Company, Frederic N. Schwartz, Defendants.**

No. 61 Cr. 772.

United States District Court
S. D. New York.

Feb. 14, 1968.

Harry G. Sklarsky, Herman G. Gelfand, Robert K. Johnson, Ira Postel, Attys., Dept. of Justice, Norman H. Seidler, New York City, of counsel, for the United States.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Connolly, Bove & Lodge, Wilmington, Del., for defendant, Chas. Pfizer & Co., Inc., John E. F. Wood, Charles E. Stewart, Jr., Robert M. Shea, J. Paul McGrath, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for defendant, American Cyanamid Co., Roy W. McDonald, Richard Y. Holcomb, Kenneth N. Hart, H. Thomas Coghill, New York City, of counsel.

Winthrop, Stimson, Putnam & Roberts, New York City, for defendant, Bristol-Myers Co., Merrell E. Clark, Jr., Terence H. Benbow, New York City, Dean C. Rohrer, Winthrop, Stimson, Putnam & Roberts, of counsel, Fish, Richardson & Neave, Henry J. Zafian, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

The three defendant corporations, on December 29, 1967, after a trial lasting some nine weeks, were found guilty by a jury on the three counts of an indictment charging (1) conspiracy in restraint of trade, (2) conspiracy to monopolize, and (3) the substantive offense of monopolizing interstate trade and commerce in a broad-spectrum antibiotic market that consisted of four so-called "wonder drugs:" tetracycline, aureomycin, terramycin and chloromycetin. Defendants have moved for judgments of acquittal notwithstanding the verdict or, in the alternative, for a new trial. The motions for acquittal renew the contention that the evidence was insufficient to warrant conviction. The alternative motions, in addition to questioning the sufficiency of the evidence, assert a number of errors in the conduct and setting of the trial and in the charge to the jury.

### I.

In considering the motions for judgment of acquittal, the court has accepted defendants' statement of the pertinent test—namely, whether the judge is convinced, upon a review of the evidence, that reasonable jurors could not have found defendants' guilt established beyond a reasonable doubt. See United States v. Kahaner, 317 F.2d 459, 467–468 (2d Cir.), cert. denied, Keogh v. United States, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed. 2d 65 (1963); United States v. Lefkowitz, 284 F.2d 310, 315 (2d Cir. 1960); see also United States v. DeSisto, 329 F.2d 929, 932 (2d Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964). It may be said that even if it made a difference, the court would apply this test rather than the measure of sufficiency applicable in civil cases, because it appears to be the correct one. See the recent review of the learning in United States v. Melillo, 275 F.Supp. 314, 316–320 (E.D.N.Y.1967). But it makes no difference in this case. For however the court might have ruled had it sat as trier of the facts, there was clearly sufficient evidence to warrant the jury's verdict.

It would serve no useful purpose to write down at length the reasons for this conclusion. The subject was reviewed in extended argument when defendants moved for acquittals after the Government had rested. The record is not significantly different now from what it was at that time.[1] The court has reconsidered, and adheres to, the appraisal made then.

Assuming *arguendo* (while doubting) that a standard more favorable to defendants should apply in appraising the sufficiency of the evidence on their motion

---

[1]. Defendant Pfizer presented a brief witness in its case. The other defendants exercised their privilege to offer no evidence after the government rested.

for a new trial under Fed.R.Crim.P. 33,[2] the court likewise concludes that this alternative prayer must be denied. The evidence was ample for conviction on any permissible standard.

## II.

Most of the asserted errors presented as grounds for the granting of a new trial have been canvassed on the record, both during the course of the trial and in the oral presentations of counsel on the present motions. The court has in each instance studied the opposed contentions with the care merited by the able submissions on both sides. It is concluded that defendants' arguments, viewed cumulatively as well as singly, afford no warrant for nullification of the jury's verdict. In the discussion below, many detailed claims of error have not been treated; there are limits of time and utility that are thought to warrant such omissions. What follows, then, is some comment on those defense contentions which appear to justify discussion supplementing what already appears in the trial record and transcripts of oral argument.

■ 1. One of the oldest and most discussed subjects in this case has been defendants' belief that publicity about attacks upon drug prices and pricing policies might prejudice them before a jury. As defendants again present it, their concern has existed because damaging "news reports, many of which resulted from governmental activities, have appeared almost continuously throughout the whole period from 1961 through 1967." [3]

Alerted to this problem well in advance of the trial, the court inquired whether defendants proposed to move for a change of venue, postponement of the trial, or some other arguably appropriate relief. Defendants chose no such course, but insisted stoutly upon their right to keep the subject open, both in its possibly direct impact upon the fairness of the trial and as support for their view that evidence claimed to show "unreasonably high" prices should be excluded as unduly prejudicial.

The case went to trial, and a jury was selected following a fairly long voir dire, during the course of which panel members with potential bias concerning drug prices were excused by the court. Many weeks later, after both sides had rested, defendants brought on a motion *to dismiss the indictment* on the asserted ground that prejudicial publicity "emanating from the government and attacking the prices and profits of the drug industry has created an atmosphere in which a fair trial of the issues in this case is not possible." It was made perfectly clear by the defendants that they sought nothing less or different at this eleventh hour than a final termination of the case in their favor. They pointedly and deliberately refrained from moving for a mistrial—a form of relief the court would probably have denied at that late stage, but one on which the court was never asked to focus with suitable adversary presentations.

On the morning of the charge to the jury, with three alternate jurors still available, defendants proposed that the court inquire briefly whether any juror had read or heard things that might have infected his impartiality. Over the government's strenuous objections, the proposal was followed. The jurors reported no problems relating to outside influences. Defendants, reserving their

**2.** Among the cases defendants cite for this proposition, see, e. g., United States v. Robinson, 71 F.Supp. 9, 10–11 (D.D.C. 1947); United States v. McGonigal, 214 F.Supp. 621, 622 (D.Del.1963). But see, e. g., United States v. Pennsylvania Refuse Removal Ass'n, 242 F.Supp. 794, 798 (E.D.Pa.1965), aff'd, 357 F.2d 806 (3d Cir.), cert. denied, 384 U.S. 961, 86 S.Ct. 1588, 16 L.Ed.2d 674 (1966); United States v. Green, 143 F.Supp. 442, 445 (S.D.Ill.1956), aff'd, 246 F.2d 155 (7th Cir.), cert. denied 355 U.S. 871, 78 S.Ct. 122, 2 L.Ed.2d 76 (1957).

**3.** Memorandum in Support of Pfizer's Motion for a New Trial, p. 33. Pfizer's arguments on this subject are adopted by the other defendants.

view that the indictment should be dismissed, expressed their satisfaction with the procedure.

Now defendants include among their voluminous papers the results of a public opinion poll by Roper Research Associates Incorporated conducted some time after the jury's verdict. The poll, based upon a sample of 516 persons from New York, Bronx, and Westchester Counties, reports that 75% of the respondents thought drug prices "unreasonably high" (as against 43% who thought the same of frozen foods, the second highest); 54% thought drug manufacturers had not "shown sufficient concern about holding down or reducing prices" (as against 24% in the case of frozen foods, again second in such unpopularity); 58% thought drug manufacturers made "unreasonably high or excessive profits" (as against 20% for frozen foods); 42% thought there was an understanding among drug manufacturers "to fix prices at a high level" (while 20% voted gasoline in second place and 32% said they did not know). Altogether, Roper reports, 83% singled out drugs for at least one adverse comment whereas frozen foods scored 53% and gasoline 43%.

The Roper interviewers asked how long such opinions had been held. Only 2% of the respondents answered "weeks" while the rest said "months" or "years" —evidently including large percentages of those who said "don't know" in response to prior questions. From this defendants draw the possibly ingenuous conclusion that the verdict in this very case—which was front-page news on the the the eve of the poll as compared with the older and more general stories, mostly in back pages, from which defendants claim prejudice—could have had no significant influence upon the anwers Roper compiled.

But there is no need to joust with the expertise of the pollsters or the inferences defendants would derive from them. Taking at face value what the poll pur-

ports to show, it cannot avail defendants at this stage.

To begin with, defendants exceed the bounds of even Roper's claims when they assert that the poll demonstrates the prejudicial impact of publicity "upon the jury panel in this case * * *."[4] The members of that panel were also "respondents." They were not anonymous, like Roper's people, but present in the courtroom, under oath. They observed fellow citizens being excused, courteously and without comment, because they had possibly disabling views about drug prices or drug companies. They were subject to scrutiny by all concerned, including defense counsel, who submitted extensive voir dire requests and participated with characteristic intensity in the screening process.

Fully cognizant of the limits of our procedures for learning the truth and insuring impartiality in jurors, the court finds every reason to suppose that this jury came from Roper's minority, not his majority.

But there are further and more compelling obstacles to the result defendants would seek from their post-verdict poll. The shortest refutation of their views is that the time passed long ago for the presentation of such materials and the conclusions defendants would draw from them.

Having sought from Roper to demonstrate the impossible, defendants then undertake to show that the procedures for empanelling a disinterested jury could not possibly have accomplished their objective in this case. Giving full weight to the delicate interests at stake, the court holds this a totally unacceptable premise at this point in the proceeding. The idea of public opinion polls, whatever their limitations, is scarcely a novel one. Distinguished, astute, and numerous defense counsel must surely be required to advance such thoughts when they are timely if they are to be considered at all. Defense counsel did no such thing. Instead, they engaged vigor-

---

4. Pfizer Memorandum, p. 35.

ously in the voir dire efforts, extending over more than a full court day, and continued until all the evidence was in on the shared assumption that a meaningful trial was in progress. In a word, defendants willingly took their chances in the hope of a favorable verdict. They should not be heard now, because the hope has been disappointed, to claim that the whole arduous business was inevitably futile.[5]

2. The indictment, in paragraphs 46 (j) and (k), charged as "means and methods" of the conspiracy that:

"(j) Pfizer and Cyanamid maintained substantially identical, non-competitive and unreasonably high prices on Terramycin Products and Aureomycin Products, respectively.

"(k) Pfizer, Cyanamid, Bristol, Upjohn and Squibb each introduced its Tetracycline Products on the market at prices which were substantially identical with each other and which conformed to the non-competitive prices of Terramycin Products and Aureomycin Products in effect as of November 1953, and all these companies maintained such substantially identical, non-competitive and unreasonably high prices until at least July 1960."

Earlier, as part of the "Background" allegations, paragraphs 37 and 42 asserted, respectively, that as of November 1953 (the alleged time of the conspiracy's inception) broad spectrum antibiotic products were being sold at an "unreasonably high price level" and were yielding "unreasonably high profits" to defendants Cyanamid and Pfizer.

Defendants moved well in advance of trial to strike the allegations of "unreasonably high" prices and profits. The motion was denied in an opinion of Chief Judge Ryan, who wrote, United States

v. Chas. Pfizer & Co., 217 F.Supp. 199, 201 (1963):

"The indictment does not charge as an element of the conspiracy to restrain or to monopolize that the defendants maintained unreasonably high prices. This is quite proper for, where an agreement fixing prices is alleged, the level of the prices fixed is not an element of the crime. The establishment of the price by joint action is the illegal act and this is so whether the price is or is not unreasonable. (United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129.) It does not follow, however, that evidence of the price is irrelevant. Certainly, uniformity of price may be and has been considered some evidence tending to establish an illegal agreement. Evidence of high or low prices and profits is also admissible as proof of a circumstance a jury may hear and weigh. From it, and other evidence, a jury may infer not only that an agreement exists among competitors to exclude others, to restrain trade and to control the market, but, supported by other evidence, the jury may infer that the alleged combination has power over the market and has exercised it with the intent to achieve a monopoly, thus establishing an offense under Sections 1 and 2 * * *."

Still in advance of trial (following a wholly commendable procedure of alerting the court to potentially large and troublesome questions to be encountered on the trial), defendants argued that evidence designed to show assertedly "unreasonable" prices and profits should be excluded. For this view they asserted again the argument of irrelevancy which had been rejected by Chief Judge Ryan.

5. The foregoing observations seem sufficient to the subject apart from the fact that the publicity touching drug manufacturers in general (though admittedly a proper concern) is far less troublesome than the focused, particularized publicity that has vitiated trials in the familiar cases defendants cite. There is nothing here like the lurid circumstances, for example, in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), upon which defendants rely.

In addition, stressing the unfavorable publicity about drug prices considered earlier in this opinion, they urged that the potential prejudice to be anticipated from such evidence outweighed any supposed relevancy it might have as proof of the offenses charged. Following the study of extensive briefs and argument, the court overruled these contentions, and the questioned evidence was received subject to defendants' continuing objection.

Having ruled the evidence admissible, the court invited all counsel to assume *pro tempore* that the ruling was correct and to turn their energies to assisting with the formulation of suitable instructions on this subject. The court renewed the invitation several times during the course of the trial. As it developed, however, though they submitted voluminous, learned, and periodically revised requests on all sorts of other things, defendants produced substantially nothing on this hotly contested subject.[6] This course was perhaps justified by the fear that the fundamental claim of irrelevancy might be impaired by submitting proposed instructions, although the court gave repeated and explicit assurances of its contrary view. Or perhaps defendants' views on the question of relevancy were so deeply held that any suggested instruction (however *arguendo* it was offered) might have been thought an exercise in self stultification.

Whatever explains the absence of requests on this topic, it may have some importance apart from the court's regret for the loss of able assistance. As the matter developed, defendants' essential objection would appear to center still upon the reception of evidence designed to show unreasonably high prices and profits rather than upon the details of the instructions as to where such evidence might be thought germane. Nevertheless, the court has reviewed the objections to this aspect of the charge and concludes that they are not well founded.

The jury was admonished that defendants were free to charge any price they could get, high or low, so long at it was not a price resulting from a price-fixing conspiracy.[7] The jurors were also cautioned that the word "unreasonable" was only an allegation, representing neither proof nor an ultimate legal conception, and that the word might usefully be translated, in the context of this case,

---

6. To be more precise, defendants Pfizer and Bristol produced nothing. Defendant Cyanamid tendered some requests which (except for the observation, adopted by the court, that price *fixing* by agreement, not price level or "reasonableness," was the ultimate question for the jury) would in effect have told the jury that the evidence admitted by the court was really irrelevant after all. No defendant undertook to formulate possible instructions approaching the theory of relevancy announced by Chief Judge Ryan and followed by the trial court.

7. "To begin with, I must emphasize and be sure you understand with perfect clarity, that neither the Sherman Act nor any other law that concerns us in this case imposes any limit on the price a company may charge for its commodity. So far as the law is concerned, so far as we have it for this case, a manufacturer is perfectly free to produce a commodity that costs him a dollar and sell it for $100 if he can find customers willing to pay that amount.

"The Sherman Act does not entitle any court or any jury to impose personal or private or any other kinds of restrictions upon the setting of prices by businessmen exercising their independent and competitive and self-interested judgment. It would be utterly wrong in short for any of us to be influenced even in the slightest degree in this case by any notion that drug prices were too high or too low or even just right, and I add those words "just right" to be sure that we return to and stay centered upon the true problem in this case, and that is the subject as I have repeated it over and over again, of alleged price fixing by agreement.

"I have told you before, and stress it again, that this is the kind of conduct against which the Sherman Act is directed in the aspect of present relevance. If prices are fixed in the way forbidden by that Act, it makes no difference that they are fixed at a happy or low or suitable or high and unpleasant level. Price fixing at any level is what is outlawed." (Tr. 6269–70.)

to mean "unusual" or "artificial" or "extraordinary." [8]

These alternative definitions were given for two reasons: first, to mitigate defendants' repeatedly stated concern that the word "unreasonably" as used in the indictment might be a source of prejudicial color affecting the jury's deliberations; second, and more importantly, to indicate with what was thought to be somewhat greater accuracy the limited role of the evidence concerning prices and profits. Defendants now urge, however, that the hopefully curative synonyms were worse than the danger that troubled them. These words, it is said, invited the jury to "speculate." There was no basis in the record, defendants argue, for the questions left with the jury by this portion of the charge.

■ Whether viewed as separate points or two formulations of a single thought, these contentions do not seem meritorious. In addition to presenting the three words to define "unreasonably" for the context of the case, the charge went on to elaborate the concept by pointing to the central issue: whether the stability and level of the prices tended to prove agreement rather than independent pricing judgments by the separate companies. (See note 8, supra.) There was ample evidence to show changes in overall demand, changes in market shares, sharp differences in cost among the companies and variations in cost within each company—all factors which "might," as the charge said, have tended to affect price. The jury was instructed to appraise these factors in considering whether the uniform prices over a long period, together with the other evidence in the case, warranted an inference of agreement among the alleged conspirators.

The jurors were also cautioned, however, that no such question should be reached at all unless the prices in question were found to have been peculiarly and unusually high in addition to remaining unchanged and uniform for many years. To pose this problem in what seemed the pertinent terms, the court touched upon the evidence by which the prosecution had sought to show (a) that the prices in question had been extraordinarily high compared with factory costs, when viewed against similar comparisons for defendants' other products; (b) that the prices had been uniform among defendants and the alleged co-conspirators for many years despite variations in cost for each seller and among the several sellers; and (c) that the uniformity had persisted despite changes in overall demand and individual market shares. On the other side, the jury was reminded, were defendants' contentions that (a) the prices were not in fact disproportionately high at all; (b) the use of "factory costs," leaving out substantial items like research, selling expenses, etc., was "partial" and misleading;[9] and (c)

8. "In the light of what I have just said, I think you will find it helpful to translate the word 'unreasonable' to mean 'unusual' or 'artificial' or 'extraordinary.' By these suggested definitions I am trying to convey the thought that the idea of unreasonableness in the present context is meaningful only if it is understood to refer to kinds of price behavior or price levels which appear to be divorced from variations and differences in available supply or demand or cost or other economic factors that may normally be expected to cause variations or changes in the prices charged in a competitive market.

"To put the thought in another and slightly shorter way, the charge of unreasonableness in this case is material only insofar as it poses the issue whether the prices involved exhibited qualities or peculiarities of a type that could be deemed evidence that such prices resulted from agreement rather than from competition. "This is the basis, apart from the subject of motive, upon which I have allowed evidence to be placed before you concerning the various cost and profit data of the several companies." (Tr. 6270–71.)

9. Pfizer and Bristol kept records in the regular course of business showing, product by product, the difference between factory cost or cost of products sold and sales price, a figure labeled "gross profit" by both companies. Although certain selling and promotion expenses were sub-

that price uniformity could, and often does, result from independent business decisions by competing sellers.[10]

Focused upon these opposed contentions, the jury was told to determine, first, whether the prices and profits

tracted from these "gross profit" figures to arrive at a so-called "operating profit" (Pfizer) or "adjusted profit" (Bristol), there appeared to be no regular business records in these companies comparing *total* cost with selling price, to show "net profit" by products. Cyanamid did keep records of the latter type, and these were placed in evidence by the government.

10. "Through such evidence [cost and profit data] the government has attempted to establish that the prices of broad spectrum antibiotics remained stable over a long period of time despite a wide disparity among sellers in production costs, despite reductions over the period in such production costs, substantial difference between production costs and sales prices, fluctuations in market shares among the sellers, and changes in overall demand for broad spectrum antibiotics.

"There has been evidence of so-called 'production costs' or 'factory' or 'standard' costs from records kept by the companies, and comparisons in these records between such costs and selling prices. Many of these records omit many factors that should be included in costs in order to compute net profits. Such factors, without exhausting them, was [sic] research, promotion expenses, and other kinds of costs. You should have these omissions in mind and take them into account when you consider the figures I have just mentioned.

"Taking such figures, the government sought to show that the gross profits they reflect were substantially greater for the products here in question than for other products made and sold by the defendants. In addition, from similar data for Squibb and Upjohn, the government has sought to show that costs of those two companies were far higher than those of the defendants, and the government argued for an adverse inference from the evidence that the prices of all five companies tended to be uniform despite these cost differences.

"The government claims that there is further evidence of a lack of price competition in the fact that the prices of broad spectrum antibiotics were maintained over a long period of time at an artificial level which enabled Squibb and Upjohn to earn normal profits despite their higher costs, while the defendants were able to earn what are alleged to have been unreasonably high profits.

"You will understand that it is the fact to which those allegations relate rather than the words in which they are couched which I take from the government contentions which are critical items for your consideration.

"On this same subject, there is evidence of overall net profit figures for Cyanamid by various product groups, and gross and operating profit figures comparing Pfizer's antibiotic drugs with its other products.

"Relying upon the data offered by the government, Bristol has argued that its profits on tetracycline were actually in line with its profits on other products. Similarly, Pfizer, at the end of the case, undertook to show that Terramycin and tetracycline did not in fact yield disproportionately high profits in comparison with other products.

"More generally, the defendants maintain that the evidence in question does not have the meaning attributed to it by the government and that it does not warrant the government's inferences in any event. Defendants emphasize that the cost data taken from the company records relate only to partial costs rather than total costs of production.

"They maintain that comparisons between such costs and selling prices lead to distorted conclusions as to so-called gross profits. Properly understood, the defendants say, the figures show profits that are not meaningful at all and not in any sense unreasonable or unusual or artificial.

"Furthermore, the defendants contend, it is neither good law nor good economics to demand a close and uniform relationship between production costs and profits. They point out that competition in the marketplace commonly results in uniform prices even though the various sellers who compete would not normally be expected to have identical or even closely identical costs of production.

"In considering this subject, as with others, you will want to weigh and appraise all the evidence and arguments, including all the data from defendants' files as have been made available comparing gross profits or other margins on broad spectrum antibiotics and any comparisons that seem to you to be significant between these figures and others in evidence that have been submitted to you.

"On the basis of all the evidence, the ultimate facts about the level and qual-

under consideration had been proved to have been "unusual or artificial or extraordinary in the sense" of the court's definition of these terms. A negative answer to this question, the instructions said, would end the subject of allegedly "unreasonable" prices and profits, excluding this matter from consideration in support of the prosecution's charges. If the answer was affirmative, the jury was told, this could be a factor, considered with all the other circumstances, waranting an inference that the prices resulted from agreement rather than competitive decisions by the defendant companies. Similarly, it was charged, "unreasonably high" profits might tend to support the charge of monopolizing.[11]

■ Upon reconsideration of these instructions, the court concludes that they conformed to the law. Defendants are correct, of course, when they insist that "unreasonably high" prices are not the subject of the Sherman Law's condemnation any more than conspiratorially fixed prices may be deemed lawful because they are "reasonable." See, e. g., United States v. Trenton Potteries Co., 273 U.S. 392, 395–401, 47 S.Ct. 377, 71 L.Ed. 700 (1927); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 222, 229, 243, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). But the jury was told this with what appears to have been an adequate measure of clarity.

■ On the other hand, defendants are mistaken in their basic premise that

ity of prices and profits and the proper inferences as to the offenses alleged in the indictment, are to be determined by you, the members of the jury." (Tr. 6271–5.)

11. "If you answer the question affirmatively, if you decide that the prices were unreasonably high in the sense in which that phrase applies to this case, you must then weigh the impact, if any, that this determination should have on your decision of the ultimate questions in the case.

"Unreasonably or extraordinarily high prices or profits charged uniformly by competing sellers over a substantial period of time may be evidence, taken with all the other circumstances of the case, supporting an inference that the parties had an agreement rather than a competitive situation with respect to prices.

"Such evidence, in the context of the whole case may, and I emphasize may because this is for your judgment, may also support the charges in Counts 2 and 3, alleging, as you recall, conspiracy to monopolize and the achievement of an unlawful monopoly. All of these questions as to this item of evidence are left with the inferences you find you should draw in your good judgment.

"You will recall in this connection my last reference to the count relating to monopolizing, that the crime of monopolization requires proof in this case of a combination or conspiracy to monopolize, plus joint possession of monopoly power by the members of this combination or conspiracy, and that I have defined monopoly power as being the power to

control prices and exclude competition. In this case I have indicated that it is relevant to show that the defendants earned unreasonably high profits as part of the government effort to show that they conspired to obtain and did obtain a monopoly. The success of that effort is for you to judge.

"To conclude finally on this subject of prices as alleged means and methods of effectuating the conspiracy, let me remind you that you should consider all of the documentary evidence and testimony bearing on what prices were actually published and actually charged in the various markets; what price changes were in fact made; what considerations entered into the various decisions with respect to prices; the competitive situation in which prices were charged; the market conditions in the various classes of trade and various markets; the peculiarities and purchasing habits of the different kinds of customers in the various markets; and all other matters which might have affected businessmen's decisions with respect to pricing.

"Take all of these things into account along with the evidence you have heard on the relative levels of prices, costs and profits in reaching your ultimate judgment as to whether this evidence tends to show the presence or absence of the conspiracy charged .by the government and whether it tends to show, along with the other pertinent elements, the existence of monopoly power as charged in Count 3 of the indictment." (Tr. 6275–77.)

prices and profits could have no bearing upon the charges of either conspiracy or monopolization or both. Controlling and familiar precedents have made clear that "an artificial price level not related to the supply and demand of a given commodity may be evidence from which such agreement or understanding, or some concerted action of sellers operating to restrain commerce, may be inferred." Cement Mfrs.' Protective Ass'n v. United States, 268 U.S. 588, 606, 45 S.Ct. 586, 592, 69 L.Ed. 1104 (1925).

In American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L. Ed. 1575 (1946), the Supreme Court noted that the defendants, who had raised their prices during a period of declining manufacturing costs and maintained them although demand fell, had reaped "tremendous profits as a result of the price increase." Id. at 805–806, 66 S.Ct. at 1137. This price increase—unrelated to "costs of production or to economic conditions generally" (147 F.2d 93, at 103 (6th Cir.))—and a price reduction only when competition from others made itself felt were said to constitute "circumstantial evidence of the existence of a conspiracy and of a power and intent to exclude competition." Id., 328 U.S. at 804, 66 S.Ct. at 1137. Again, in United States Maltsters Ass'n v. Federal Trade Commission, 152 F.2d 161, 163 (7th Cir. 1945), proof that prices had remained stable while the cost of the principal ingredient of manufacture "varied considerably" and the "manufacturing costs of the various members [of the Association] varied as much as 20 to 30%" was part of the circumstantial evidence relied on to support an inference of conspiracy. See, also, Triangle Conduit & Cable Co. v. Federal Trade Commission, 168 F.2d 175, 179 (7th Cir. 1948), aff'd by an equally divided Court sub nom. Clayton Mark & Co. v. Federal Trade Commission, 336 U.S. 956, 69 S.Ct. 888, 93 L.Ed. 1110 (1949); United States v. Eli Lilly & Co., 24 F.R.D. 285, 289–294 (D.N.J.1959).

■ Although the "reasonableness" of a price cannot justify price-fixing, claims of "reasonableness" or "unreasonableness" are not, as defendants argue, necessarily irrelevant. It is open to those charged with conspiring to fix prices to show that prices were "reasonable" in respects that tend to show lawful pricing decisions rather than agreement. For example, in order to show "that they were following an economically dictated practice of conscious parallelism of prices, rather than engaging in any illegal conspiracy to fix prices," Sherman Act defendants may offer "explanatory economic evidence" consisting of "proofs of similarity of costs, operations, marketing procedures, and other economic factors affecting price changes, alleged to be common to all, and * * * [have] expert witnesses * * * testify in support of their theory." Continental Baking Company v. United States, 281 F.2d 137, 141, 146 (6th Cir. 1960); see Maple Flooring Mfrs' Ass'n v. United States, 268 U.S. 563, 567–568, 45 S.Ct. 578, 69 L.Ed. 1093 (1925); Pevely Dairy Co. v. United States, 178 F.2d 363, 367–369 (8th Cir. 1949), cert. denied, 339 U.S. 942, 70 S.Ct. 794, 94 L.Ed. 1358 (1950); Ohio Valley Electric Corp. v. General Electric Co., 244 F.Supp. 914, 951–952 (S.D.N.Y.1965).

■ Similarly, it seems to be well established that the enjoyment of "substantial profits" can "be given consideration along with myriad other circumstances for the purpose of determining whether in combination they are elements in the generation of that power to monopolize that constitutes violation of the law." United States v. General Electric Co., 82 F.Supp. 753, 895 (D.N.J.1949); see id. at 894–895; American Tobacco Co. v. United States, 328 U.S. 781, 804–806, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); United Banana Company v. United Fruit Company, 245 F.Supp. 161, 176–177 (D. Conn.1965), aff'd, 362 F.2d 849 (2d Cir. 1966); Banana Distributors, Inc. v. United Fruit Company, 162 F.Supp. 32, 39 (S.D.N.Y.1958), rev'd on other grounds, 269 F.2d 790 (2d Cir. 1959).

The instructions concerning prices and profits were formulated with a view to applying the foregoing principles to the circumstances of this case.[12] Defendants have not shown any departures or misapplications that would appear to warrant a new trial.

3. As is not uncommon in cases of this type, most of the evidence presented by the prosecution came from defendants' corporate records and from testimony of defendants' top executives. In their extensive cross-examination (a term literally applicable, but not in its usual sense) of their own people, defense counsel were permitted to ask whether the witnesses under oath admitted or denied the charges against their companies. To questions often couched in the words of the indictment, these officials uniformly and flatly denied that there had been any conspiracy of any kind among the defendants. In addition, of course, these officials testified in detail about the events under scrutiny, and gave business explanations for the various agreements and other actions claimed by the government to reflect, in their totality, the existence of a conspiracy to fix prices and restrain trade.

In arguing for acquittals by the court after the prosecution had rested, counsel for Cyanamid observed that the jury would have to find that all these corporate officers had been "lying" before a conviction could be justified. When the court suggested that this was too simple a view of the law governing antitrust conspiracies—having in view the elementary point that the Sherman Act may be violated by the conduct of people who believe their motives are good and their actions lawful—counsel appeared to express his agreement (Tr. 5404). Later, however, on argument of the present motions, it was made clear that this was not a matter on which the court and defense counsel were (or are) in accord. The defense has pressed, and continues to press, the view that the jury was required in effect to find perjury by the corporate officers before it could return a verdict convicting the companies.

The court's instructions contained repeated reminders that the actions taken by the defendants were entirely lawful if taken independently; that the jury was to consider whether the evidence reflected only normal, independent, self-interested, and lawful business conduct, or unlawful conspiratorial action; and that the essential and pervasive question was whether the government's charge of conspiracy had been proved (Tr. 6197, 6200–01, 6202–03, 6206–07, 6208–09, 6212–14, 6221–22, 6223–24, 6225–26, 6227, 6231–32, 6245–46, 6250, 6251, 6256–57, 6258–59, 6259–59a, 6260, 6261, 6263, 6265, 6266–67, 6269, 6284). These references had the obvious purpose of reminding the jury of the detailed accounts and explanations given by defendants' officers concerning the events in question. In addition, however, the charge said this:

"Along with all the other evidence in the case, you have heard the sworn

---

12. In addition to the instructions on this subject summarized above, the jury was reminded of the government's claim "that broad spectrum antibiotic sales comprised a major portion of the business, and a major source of the profits, of the defendant companies in varying proportions * * *." Then the charge said:
"These assertions, to the extent they are borne out by the evidence, may be considered as part of the general background and setting in which the events of the case transpired. Such evidence may also serve as some evidence of motive, which is always a relevant concern and which has been argued at some length by government counsel. But you will also understand, of course, that the existence of a motive does not serve in itself to establish the commission of any offense charged, or any element of any such offense."
Such an instruction seems correct. See Interstate Circuit v. United States, 306 U.S. 208, 222, 225, 59 S.Ct. 467, 83 L.Ed. 610 (1939); Morton Salt Company v. United States, 235 F.2d 573, 577 (10th Cir. 1956); American Tobacco Co. v. United States, 147 F.2d 93, 118 (6th Cir. 1944), aff'd, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

testimony of the principal officers of the three defendant companies, and you have heard each of them deny in broad terms that there was any understanding or agreement among them, either express or implied, that there would be uniform and identical prices, or that there would be any exclusion of competitors, or that they would seek together in any way to achieve monopoly power. You must, obviously, give due and deliberate thought to this testimony, and ultimately attribute to it such weight as it merits in your impartial judgment. In performing this task, you will have in mind the definition of a combination or conspiracy as it has been given to you in these instructions, recalling among other things, that the final answer to this central question in this case must be based upon the actual conduct of the defendants during the period covered by the indictment, and that the things the defendants did and said at the time may in such a case be weightier than the things they say thereafter. You will take into consideration, also, that if all the elements are shown to establish a conspiracy, it would make no difference that the conspirators did not believe they were violating the law or intend to commit such a violation.

"This is by no means to suggest to you that you overlook or reject the sworn testimony of defendants' officers. That's for your judgment, not mine. The point being made here, as you understand, is that assertions of innocence by such officers may reflect partly legal as well as factual contentions and must be weighed along with all the evidence of every kind that has been submitted to you." (Tr. 6280–81)

In exceptions to this portion of the charge, defense counsel argued that the reference in the last-quoted sentence to "*legal* as well as factual contentions" was wrong because, as counsel urged, their officers' testimony "was so explicit as to what these men were talking about, what

they were not talking about, what their objectives were and what was not included in their objectives that there is no room for that idea." The argument is renewed now, and there is added the contention that mentioning "legal * * * contentions" left the jury "completely at sea."

■ Read as a whole—in the fuller context of the charge as a whole and in light of the pertinent law—the questioned passage does not appear to have been prejudicially erroneous. The exception on the spot, it may be noted, did not propose amplification of the phrase which used the word "legal," but urged merely that there was "no room" for the concept at all. Passing that, the court concludes that defendants are mistaken. The substance of the thought conveyed to the jury seems correct. There are passages in the books, emphasizing that antitrust defendants "must be held to have intended the necessary and direct consequences of their acts.," United States v. Patten, 226 U.S. 525, 543, 33 S. Ct. 141, 145, 57 L.Ed. 333 (1913); cf. United States v. Masonite Corp., 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942), under which defendants' conclusory denials of guilt might be deemed substantially weightless. This court took no such view, and did not charge (as requested by the prosecution) that "the law presumes that persons intend the necessary and direct consequences of their acts."

■ Having allowed defendants' officers to make blanket denials of guilt from the stand, the court charged that these "assertions of innocence" were not to be taken as such nakedly "factual" statements that (as defendants had urged) the choice lay between condemning them for "lying" or acquitting. The thought would appear to accord with the learning that conspiracies forbidden by the Sherman Act are not merely (or normally) matters of explicit "agreement" in the simple contract sense, but are commonly to be found "in a course of dealing or other circumstances as well as in an

exchange of words." American Tobacco Co. v. United States, 328 U.S. 781, 809–810, 66 S.Ct. 1125 (1946); cf. United States v. Singer Mfg. Co., 374 U.S. 174, 195, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963); United States v. Parke, Davis & Co., 362 U.S. 29, 44, 80 S.Ct. 503, 4 L.Ed. 2d 505 (1960). The court refrained from charging, as the government requested, in the language of *American Tobacco,* that "[w]here the conspiracy is proved, as here, from the evidence of the action taken in concert by the parties to it, it is all the more convincing proof of an intent to exercise the power of exclusion acquired through that conspiracy." 328 U.S. at 809, 66 S.Ct. at 1139. On the other hand, the portion of the charge here in question was an attempt to take account of the point that the conclusion as to "innocence" or "guilt," in the circumstances of such cases as this, is not a mere question of "fact" to be decided by a simple-minded judgment as to whether a witness "lied" when he proclaimed innocence. See United States v. General Motors Corp., 384 U.S. 127, 141–142, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); American Tobacco Co. v. United States, 147 F.2d 93, 112, 114 (6th Cir. 1944), aff'd, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); United States v. Johns-Manville Corporation, 245 F.Supp. 74, 84 (E.D.Pa.1965); cf. United States v. Trenton Potteries Co., 273 U.S. 392, 406–407, 47 S.Ct. 377, 71 L.Ed. 700 (1927); Hillside Amusement Co. v. Warner Bros. Pictures Distributing Corp., 224 F.2d 629, 630 (2d Cir. 1955); United States v. Dichiarinte, 385 F.2d 333, 340 (7th Cir. 1967).

■ The interrelated (perhaps essentially redundant) point that defendants would not be absolved merely because they believed their conduct lawful is based upon settled law. See, e. g., United States v. Patten, supra, 226 U.S. at 543, 33 S.Ct. 141; cf. United States v. General Motors Corp., supra, 384 U.S. at 142, 86 S.Ct. 1321; United States v. Griffith, 334 U.S. 100, 105, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); United States v. General Instrument Corporation, 87 F. Supp. 157, 193 (D.N.J.1949). Defendants do not appear to question this proposition as such.

4. Defendants complain of the court's failure to charge that if the jury found that any defendant, in the course of lawful business conduct, could reasonably have taken action alleged to constitute a means and method by which the conspiracy was effectuated, such action could not in any way tend to prove a conspiracy. The court did charge, repeatedly, that the jury should consider, with respect to each alleged "means and method," whether the actions in question were simply part of "the normal course of lawful business conduct" or whether they tended to show the existence of a conspiracy. Over and over again, the instructions told the jury (as defendants had requested) to determine whether particular actions tended "to show the presence of a conspiracy, the absence of a conspiracy, or nothing either way." To have gone further—to charge that conduct found consistent in itself with lawful behavior could "not, in any way," tend to prove a conspiracy [13]— would have been contrary to familiar principles.

■ That a particular action is consistent with lawful business behavior does not mean that it, along with evidence of other actions similarly consistent with lawful business behavior, may not support an inference of conspiracy. It is fundamental that "acts absolutely lawful in themselves may be steps in a criminal conspiracy." "Wholly innocent acts" may be "part of the sum of the acts" which make up the conspiracy. American Tobacco Co. v. United States, 147 F.2d 93, 107 (6th Cir. 1944), aff'd, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); see also Schine Chain Theatres v. United States, 334 U.S. 110, 119, 68 S.Ct. 947, 92 L.Ed. 1245 (1948); Swift and Company v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905). And so it "hardly needs statement that the char-

13. Pfizer Memorandum, p. 20; see, also, pp. 21–22.

acter and effect of a conspiracy is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." United States v. Patten, 226 U.S. 525, 544, 33 S.Ct. 141, 145 (1913): "[T]he duty of the jury was to look at the whole picture and not merely at the individual figures in it." American Tobacco Co. v. United States, supra, 147 F.2d at 106; see also Continental Ore Co. v. Union Carbide and Carbon Corporation, 370 U.S. 690, 698–699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

Defendants' position is at odds with the quoted propositions. The rejected request would have told the jury, incorrectly, to "dismember" the pattern of conduct alleged to have been conspiratorial. Indeed, the request is inconsistent with the defense position (at least as stated in summation by counsel for Bristol) that the jury should consider the "whole case" and each company's "total conduct" in resolving the key issue of conspiracy (Tr. 5860).

As has been mentioned, the court has considered all of defendants' contentions, both individually and in their total impact. It is concluded that grounds have not been shown for either a judgment of acquittal or a new trial in the case of any defendant. Accordingly, the motions for such relief are in all respects denied.

It is so ordered.