**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Lewis R. GOODMAN, John E. Lawson,
Defendants-Appellants.**

No. 87–5116.

United States Court of Appeals,
Eleventh Circuit.

Aug. 1, 1988.

John Evans, Zuckerman, Spaeder, Taylor & Evans, G. Richard Strafer, Coral Gables, Fla., for John E. Lawson.

E. David Rosen, Rosen Law Offices, P.A., Lawrence N. Rosen, Miami, Fla., for Lewis R. Goodman.

Dexter W. Lehtinen, U.S. Atty., Miami, Fla., John J. Powers, III, Dept. of Justice, Robert J. Wiggers, Washington, D.C., Nezida Davis-Sherman, Anti Trust Div., U.S. Dept. of Justice, Atlanta, Ga., for U.S.

Before FAY and VANCE, Circuit Judges, and HOFFMAN [*], Senior District Judge.

[*] Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

[1] IWS was sentenced on October 24, 1986, to pay a fine of $375,000.00. Lawson was placed on probation for two years with a special condition of two hundred community service hours and was fined the sum of $10,000.00 on February 6, 1987. Goodman, according to his brief, was sentenced to fifteen months imprisonment on February 10, 1987. He was ordered to be confined for thirty days in a community treat-

WALTER E. HOFFMAN, Senior District Judge:

Appellants Lewis R. Goodman and John E. Lawson were indicted along with Industrial Waste Service, Inc. (IWS) in the Southern District of Florida for violating the Sherman Act, 15 U.S.C. § 1. The charge involved the alleged allocation of customers in the garbage disposal industry in Dade and Broward County, Florida between 1971 and November 7, 1985, the date of the indictment. A second count of the indictment charged appellant Goodman with obstruction of justice in violation of 18 U.S.C. § 1503. A judgment of acquittal was granted by the court as to the obstruction of justice charge at the close of the government's case. IWS entered a plea of *nolo contendere* to count one. Appellants were tried and convicted on the Sherman Act conspiracy charge from which they appeal.[1]

## FACTS

Goodman was the chief operating officer of United Sanitation Services (United) during the time period alleged in the indictment. United was engaged in the solid waste disposal business providing garbage removal to commercial accounts in Dade County and part of Broward County, Florida. These accounts were generally construction sites, stores, condominiums, apartment houses and warehouses. United was the largest hauler in the area with approximately fifty-five to sixty trucks and seventy-five hundred to eight thousand customers.[2]

Appellant Lawson was a corporate officer of IWS from the early 1970's until he left to form his own company, Imperial Sanitation Services, Inc., in December of 1981. IWS was a slightly smaller garbage

ment center with the remainder of the sentence suspended. A three year probationary period was imposed with a 1,200 community service hour requirement. He was also fined $200,-000.00. Goodman elected to begin serving his sentence and produced letters of credit to guarantee the payment of the fine. Brief for Lewis R. Goodman at 3.

[2] These figures on United are from the early part of 1987.

disposal company than United, but the two were by far the largest in the industry in that area. A number of small haulers with only a few trucks were also present in the market.

The evidence at trial showed that United and IWS refrained from soliciting accounts of other haulers and pursued mainly new construction sites. There was also some evidence that possibly accounts were traded as compensation between haulers when one would acquire the account of another. Appellants claimed, and some evidence supported, that the policy not to solicit the accounts of other haulers was to avoid interference of contract suits and that the policies were internal to the particular companies, i.e., this was not an agreement between haulers.

As a part of its case the government introduced evidence of a major price increase in United's service. This evidence involved a large national garbage hauling and disposal company named Browning Ferris Industries (BFI). That company was new in the South Florida market and began soliciting United's and IWS's customers. Alfred Camacho the controller of WIN Building Corporation (WIN), a real estate developer in South Florida, testified concerning the garbage service received at some of WIN's projects. The following listings represent the prices charged in the contracts introduced by the government at two of WIN's projects serviced by United:

(A) Warehouse—Northwest 20th Street, Miami, Florida

| Date | Price Per Month |
| --- | --- |
| Dec. 1, 1979 | $ 81.00 |
| May 1, 1981 | 121.50 |
| Jan. 1, 1982 | 136.00 |
| Feb. 1, 1983 | 142.00 to 149.50 |
| Feb. 1, 1984 | 121.50 |

(B) Apartment House ("Imperial at Kendall")—Southwest 77th Avenue and 90th Street, Miami, Florida

| Date | Price Per Month |
| --- | --- |
| Dec. 1, 1979 | $ 799.00 |
| June 1, 1980 | 919.50 [3] |
| Feb. 1, 1981 | 1,370.00 |
| April 1, 1982 | 1,546.00 |
| Feb. 1, 1984 | 1,250.00 |

In (A), the warehouse, there is a drop in price from 1983 to 1985. Camacho explained that decrease on direct examination:

Q. Did there come a time in early 1984, when you were solicited by another garbage hauler?

A. Yes.

Q. And what hauler was that?

A. B.F.I.

Q. Did B.F.I. give you a quote?

A. Yes, they did.

Q. Did you go with B.F.I. for service?

A. No we didn't.

Q. Did you remain with United for garbage service?

A. Yes, we did.

Q. Would you explain—Well, did you contact United, United Sanitation, at the particular time that you got a quote from B.F.I.?

A. Yes, we did. I contacted United Sanitation.

Q. And did United Sanitation make you an offer, an offer to keep the service at that time?

A. Yes.

Q. And was the offer that United made, the price that was reflected in that 1984 contract that you mentioned?

A. That's right.

Q. A hundred twenty-one dollars and fifty cents?

A. Uh-huh.

Q. Were there any other changes in the new contract with United for the service on that particular period?

A. Well, two things we tried to get. We tried to limit the increase that United could pass along each year. This was a three year contract.

---

**3.** Although the page of the transcript where this exhibit (Government Exhibit 321) was introduced states the contract price as $119.50, the contract itself reads as $919.50.

So, we did it by putting a clause in there, the increases would be no more than five percent per year. And we also asked that the increase in dumping fees not be passed on during the term of the contract.

R. at 463–64. A similar drop appears in the Imperial at Kendall apartment house contracts from 1982 to 1984. Camacho explained that he had received a bid from "another company," communicated it to United, and was then able to negotiate the lower price. Camacho also testified that in both instances he was unable to secure a bid from any other garbage haulers in the area.

Another witness called by the government was Philip Linhoff who negotiated contracts for garbage service for the Tony Roma Corporation in the Miami area. He did this for the nine Tony Roma restaurants in Dade and Broward County between May 1980 and August 1984. United supplied service for one of these restaurants located in Sunny Isles, Florida. In early February of 1982 United's prices increased and BFI took the account for three hundred seventeen dollars per month. United had increased its service from approximately three hundred dollars to one thousand dollars per month. Linhoff also testified that the North Miami Tony Roma restaurant was serviced by United until an April 1982 rate increase, at which time BFI underbid United and took over service of the account.

In an effort to rebut this evidence of high prices the defendants attempted to show an increase in environmental and other costs associated with the garbage removal and dumping business. They also attempted to show that BFI's prices were not competitive, and were even predatory,[4] as BFI suffered losses of approximately $1.8 million in South Florida for the five year period of 1979 through 1983. The government stipulated to the authenticity of BFI's profit and loss statements, but objected on relevancy grounds. The district court sustained the objection finding that the evidence was irrelevant in a charge of conspiracy to violate the antitrust laws.

## DISCUSSION

Appellants contend that the trial court committed error in excluding evidence of BFI's profit and loss statements. They argue that the government opened the door for this evidence by introducing testimony of BFI's presence in the market undercutting the prices of United and IWS. The government takes the position that the issue of non-competitive or high pricing is not an element of the offense of conspiracy to allocate customers under the Sherman Act, 15 U.S.C. § 1, and therefore is not relevant.

In *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1090 (5th Cir.), *cert. denied*, 437 U.S. 903, 98 S.Ct. 3088, 57 L.Ed.2d 1133 (1978), the former Fifth Circuit held that a customer allocation agreement alone is a *per se* violation of 15 U.S.C. § 1. *Cadillac* involved a customer allocation agreement in Florida among a number of companies in the industrial garment industry. These companies would supply uniforms and industrial clothes to customers on a rental basis, along with the laundry and replacement of garments when necessary. The defendant companies agreed not to solicit each other's customers and to discourage customers from changing suppliers. If this discouragement did not work, the managers of the garment companies would meet to trade customer accounts in an effort to equalize the volume of the business. *Cadillac*, 568 F.2d at 1081.[5]

---

4. The term "predatory" means that present revenues are sacrificed for the purpose of driving others out of the market and then recouping the losses at a later time through higher prices. *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 723 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976).

5. All Fifth Circuit decisions handed down prior to the close of business on September 30, 1981, are binding precedent upon the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

■ Undoubtedly, the government is correct that a customer allocation agreement is a *per se* violation of the Sherman Act, and therefore pricing is not relevant. From the indictment through closing arguments the government attempted to prove the existence of the conspiracy, among other ways, with evidence of non-competitive high prices, although such pricing is not a necessary element of the charge. The indictment itself alleges an effect of the conspiracy that:

(a) Prices charged by the defendant corporation and the co-conspirator waste disposal service companies in Dade and Broward Counties have been maintained at artificially high and non-competitive levels.

At trial, the government's proof of these non-competitive high prices involved the testimony of two witnesses, heretofore noted, concerning BFI's underbidding of United's prices.[6] Alfred Camacho testified that he was able to renegotiate one contract with United due to a low bid from BFI, and a second after receiving a bid from "another company." Philip Linhoff testified that BFI underbid United at two Tony Roma restaurant locations and took the accounts.

■ The Assistant United States Attorney continued to make pricing an issue in the trial in a reference made during closing argument to a price increase with one United account:

And they were able to do that and make that kind of price increase. Again, ladies and gentlemen, because they knew that even with that kind of price increase, the other haulers were not going to go in there to take that account.

R. at 1410. In essence, the government's own handling of the case made pricing a relevant part of this customer allocation charge when evidence of non-competitive high prices was used to help prove the existence of a customer allocation conspiracy. Counsel for the government even admitted the relevancy during oral argument before this court:

JUDGE HOFFMAN: How was it submitted to the jury in the court's charge?

MR. WIGGERS: It was submitted as a customer allocation conspiracy, but obviously one of the effects that one would expect to see was above competitive prices, but that, that was not, that was not a major factor in the government's argument. And certainly, there was no argument by the government in its closing argument, that BFI was—

JUDGE HOFFMAN: It seems to be so fundamental that the price that one of these garbage companies charged would be relevant in determining whether there would or would not be a custom allocation, customer allocation.

MR. WIGGERS: It's certainly an inference, but that, it was not a central feature of this case, and it was certainly not such a central feature that it would have been worth spending another three weeks trying the issue of whether or not Browning Ferris's prices were in fact predatory. Not just below cost, but predatory. To allow the, to allow the defendants—

JUDGE HOFFMAN: Well, if it is a customer allocation charge isn't pricing relevant?

MR. WIGGERS: It is relevant. Yes, Your Honor.

JUDGE HOFFMAN: Well, the court held on your objection that it was irrelevant.

MR. WIGGERS: Your Honor, Your Honor—what he held irrelevant was the theory that Browning Ferris was engaged in predatory pricing, unfair competition—

JUDGE HOFFMAN: Well—

---

**6.** Most of the evidence of BFI's actual pricing was compared to the figures charged by United. There was testimony, however, from a former sales representative of BFI that he was successful in taking accounts away from IWS. In addition, artificially high and non-competitive prices were alleged in the indictment to be an effect of this conspiracy involving the appellant Lawson and IWS. Therefore, although the BFI pricing evidence was compared to United's prices, it was equally material in proving the conspiracy in relation to Lawson.

MR. WIGGERS: not, not, not, not, not the simple fact that—

JUDGE HOFFMAN: No matter which, why he let it in or cut it out if you say its relevant for this case that's all you need isn't it?

MR. WIGGERS: It was not—well, Your Honor, I think, I think the point is—it was not relevant on the theory that the defendants were advancing at trial. They, they weren't simply trying to show, well, you know, Browning Ferris was taking a loss so therefore maybe United would have been taking a loss if it had lowered its prices—

JUDGE HOFFMAN: Well I come back—

MR. WIGGERS: they, they, they, they, they, they were going off on the entire theory—

JUDGE HOFFMAN: I come back to my question then. I thought you said that pricing was material in connection with customer allocations or was relevant. That's what I thought the tape would show. I may be wrong.

MR. WIGGERS: Your Honor, very high prices may be an element, one element from which the jury could infer that there was a conspiracy going on here. That much we'll concede. The defendants here had plenty of opportunity to show that their prices were indeed justified by costs. They put on an expert economist. They put on United's own controller who knew all about their costs and could easily have justified—

JUDGE HOFFMAN: The defendant doesn't carry the burden of proof though, Mr. Wiggers.

When appellants attempted to meet the government's evidence with the BFI profit and loss statements, the government made an objection upon relevancy grounds which was sustained by the district court. The effect of this exclusion was that after the government introduced all of its pricing evidence, the appellants were denied an opportunity to show that BFI was losing

money—$1.8 million from 1979 through 1983—and therefore, could not be considered as an example of a company charging competitive market prices. Clearly, the BFI profit and loss statements are relevant pieces of evidence, i.e., "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Although pricing is not an actual element of customer allocation, see Cadillac, 568 F.2d at 1090, once the government used that evidence in attempting to prove the existence of the customer allocation agreement the door was open for the appellants to rebut the same. Evidence which would show that the prices charged by United and IWS were not artificially high and non-competitive makes the conspiracy, as the government attempted to prove it, less probable.

A similar situation arose in a Sixth Circuit case involving a conspiracy to fix prices of baking products. *Continental Baking Co. v. United States*, 281 F.2d 137 (6th Cir.1960).[7] The government's evidence in *Continental* established that representatives of the defendant companies met prior to price increases in the bakery products. There was no direct evidence which showed that the representatives collectively agreed to raise prices, but merely that all of the companies did raise their prices at the same time. *Id.* at 143. When the defendants attempted to introduce evidence of an "economically dictated practice of conscious parallelism of prices, rather than engaging in any illegal conspiracy to fix prices," *id.* at 141, the court rejected it as being wholly immaterial. The trial judge ruled that price fixing agreements are *per se* violations of the Sherman Act and therefore evidence of cost factors would be irrelevant. *Id.* at 141–42.

In reversing the trial court's decision the Sixth Circuit held that explanatory evidence must be distinguished from the defense of justification when dealing with a

---

7. The trial judge, subsequent to his ruling on the BFI profit and loss statements, held that the defendants were entitled to introduce economic evidence pursuant to *Continental Baking*. It is apparent from the record that the trial judge was not aware of the *Continental Baking* decision until this time. R. at 1243–44.

*per se* violation of the Sherman Act. *Id.* at 143. Reasonableness of the prices is no defense if the agreement is found to exist, but defendants should be entitled to place their evidence before the jury in an effort to explain the pricing similarity. *Id.* at 144.

> The proffered evidence was circumstantial in nature, from which the jury could draw an inference that the price changes resulted from economic factors. The evidence admitted by the Court that meetings were held by the appellants following which the price changes took place was also circumstantial evidence from which the jury might draw an inference that the price changes resulted from agreement. It is for the jury to weigh the evidence and determine what inferences to draw therefrom.

*Id.* at 143.[8]

In the case at bar, the government alleged an effect of the conspiracy to be artificially high and non-competitive prices; introduced evidence that prices charged by the companies were very high and non-competitive; argued to the jury that the haulers were able to increase their prices without fear of losing an account to another company due to the conspiracy; and even admitted that very high prices are *"one element from which the jury could infer that there was a conspiracy going on here."* (Emphasis added). The proffered evidence that BFI's prices were below cost, depicted in BFI's profit and loss statements, is circumstantial evidence from which a jury could draw an inference that these prices charged by United and IWS were competitive and not artificially high, i.e., that BFI's prices could not be used as an example of competitive market prices from which a comparison could be made. Since the evidence of BFI undercutting United's prices was introduced by the government, and the indictment with allegations of artificially high and non-competitive prices was submitted to the jury, they also should have had the benefit of the BFI profit and loss statements. Without these documents the jury could not properly weigh the evidence to determine the inferences to draw therefrom.

The trial court may not exclude relevant evidence which is crucial to the establishment of a valid defense. We, however, may not reverse the decision of the district court to exclude such evidence unless there was an abuse of discretion. *United States v. Wasman*, 641 F.2d 326, 329 (5th Cir. Unit B Apr. 1981).[9] If "proffered evidence

---

8. A number of district courts, following *Continental Baking Co. v. United States*, 281 F.2d 137 (6th Cir.1960), have allowed economic evidence to be introduced in defense of alleged Sherman Act violations. In *United States v. Nu-Phonics, Inc.*, 433 F.Supp. 1006 (E.D.Mich.1977), the indictment alleged a price-fixing scheme among hearing aid dealers in the Detroit area, in which prices were maintained at artificial and non-competitive levels. The court held that the defendants must be allowed to produce evidence which could establish that no price-fixing agreement existed by rebutting the allegation of artificially high and non-competitive prices. *Id.* at 1014.

Three corporations were found guilty of conspiracy in restraint of trade, conspiracy to monopolize, and the substantive offense of monopolization of interstate commerce in *United States v. Chas. Pfizer & Co.*, 281 F.Supp. 837 (S.D.N.Y.1968), *rev'd on other grounds*, 426 F.2d 32 (2nd Cir.1970). The underlying facts of the offenses involved the marketing of four antibiotics: tetracycline, aureomycin, terramycin and chloromycetin. *Chas. Pfizer*, 281 F.Supp. at 839. Although the defendants' motions for acquittals and new trials were ultimately denied, the court found that the defendants' explanatory economic evidence must be introduced in order to prove their defense of economically dictated parallel pricing. *Id.* at 847.

The court in *Ohio Valley Electric Corp. v. General Electric Co.*, 244 F.Supp. 914 (S.D.N.Y. 1965), determined that economic data was relevant in allowing the defendants to establish their defense. This was the first of a number of private antitrust actions brought against electrical equipment manufacturers after criminal antitrust proceedings had been filed against the same defendant manufacturers in 1960. Among other claims, the plaintiffs alleged price fixing stemming from their purchase of eleven steam turbine engines from the defendants. *Id.* at 917. The plaintiffs' position at trial involved evidence of uniform price movements and later large discounts subsequent to the exposure of the conspiracy. The court held that the defendants were entitled to offer economic evidence in support of their defense that market forces caused these price movements. *Id.* at 952.

9. The defendant in *United States v. Wasman*, 641 F.2d 326 (5th Cir. Unit B Apr. 1981), was prosecuted for using a false name on a passport. He attempted to introduce evidence that he submitted a non-semetic sounding name so that he

is of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility." *Holt v. United States*, 342 F.2d 163, 166 (5th Cir.1965). As our foregoing discussion indicates, the excluded evidence was relevant to the appellants' defense and should have been admitted by the district court. Accordingly, we reverse the conspiracy convictions of the appellants and remand to the district court for a new trial, if the government be so advised.[10]

## OTHER ISSUES

Appellants have raised a number of other issues which are now moot in light of our decision on the relevancy question, or are otherwise without merit. A juror misconduct charge was made by both appellants that an outside influence tainted the verdict. This issue is of no consequence since the appellants will receive a new trial with a new jury. Likewise Lawson's claim that count two of the indictment charging Goodman with obstruction of justice should have been severed from Lawson's trial is no longer an issue. Goodman was granted a judgment of acquittal on that count so it will not be an issue in the new trial.

Appellant Goodman's final assignment of error concerns the immunity grants made to a number of the government's witnesses. Appellants agreed not to impeach the witnesses on the immunity issue and claim that this precluded the government from questioning witnesses about their grants. His position is that this would tend to bolster the testimony of the witnesses. Appellant fails to cite any law which stands for this proposition and we find no merit in his argument. Any conceivable error was cured by the court's instruction for the jury to scrutinize carefully the immunized wit-

ness' testimony and consider whether the witness could advance his own interest by coloring his testimony.

For the foregoing reasons, we reverse the convictions of Goodman and Lawson and remand for a new trial.

REVERSED and REMANDED.

---

could carry on business with certain Arabs. The former Fifth Circuit concluded that the trial court erred in denying the defendant the opportunity to produce the relevant testimony to support his defense that he had no bad motive in assuming another name for business purposes. *Id.* at 328–29.

**10.** Appellant Lawson also claims that the government suppressed evidence in its possession which was favorable to the appellant in

violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1976). Lawson's allegation is that this evidence concerns predatory pricing practices of BFI throughout the country and was in the possession of a number of governmental agencies. We are not persuaded by appellant there is a potential *Brady* violation, but decline to rule on the point as he will have an opportunity to bring the issue before the district court during the new trial.